QUALITY INFUSION CARE,
INC., Appellant,

v.

HEALTH CARE SERVICE CORPORA-
TION d/b/a Blue Cross and Blue
Shield of Texas, a Division of Health
Care Service Corporation, and South-
west Texas HMO, Inc. d/b/a HMO
Blue Texas, Appellees.

No. 01–05–00753–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 19, 2006.

370

Peter Schneider and William Truman Jones Jr., Grady, Schneider & Newman, L.L.P., Houston, TX, for Appellant.

Howard R. King, Hill, Finkel & King, L.L.P., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

In this contract dispute, the trial court rendered judgment in favor of appellees, Health Care Service Corporation d/b/a Blue Cross and Blue Shield of Texas ("BCBSTX") and Southwest Texas HMO, Inc. d/b/a HMO Blue Texas ("HMO Blue"), after a bench trial. Quality Infusion Care, Inc. ("QIC") appeals, contending that the trial court misconstrued both the meaning of the contractual term "provider" and the payment provisions of the contract, and therefore erred in concluding that it—rather than appellees—breached the contract. QIC further contends the trial court erred in awarding appellees their attorney's fees. In addition, QIC asserts the trial court erred in granting a no-evidence summary judgment for appellees on its claims for fraud, fraudulent inducement, negligent misrepresentation, and tortious interference with existing and prospective business relations. We modify the trial court's judgment and affirm.

## BACKGROUND

QIC provides infusion therapy services, such as chemotherapy, to patients who are seriously ill. In March 2002, QIC contracted with BCBSTX to provide home infusion therapy services to patients who are subscribers of various health insurance plans administered by BCBSTX and its affiliates, including HMO Blue. The contract, which became effective June 1, 2002, requires QIC to obtain precertification from BCBSTX before providing infusion therapy services to a particular subscriber. Following treatment, QIC must submit its claims for payment at the rates specified in an exhibit attached to the contract (the "Exhibit A rates").

In May 2002, one month before the contract became effective, and again in July 2002, appellees advised QIC in writing that

they did not recognize QIC as a "network" provider. As a result, appellees refused, in many instances, to precertify QIC's provision of infusion therapy services to subscribers whose health care coverage does not include "out-of-network" benefits. Though it failed to obtain precertification, QIC nonetheless administered treatment to several of these subscribers and subsequently submitted claims to appellees for payment. Following appellees' refusal to pay, QIC brought suit, alleging fraud, fraudulent inducement, constructive fraud, negligent misrepresentation, tortious interference with existing and prospective business relations, breach of contract, and promissory estoppel.

In the meantime, as the result of an audit, appellees learned that they had overpaid several claims submitted by QIC. In accordance with a contractual provision requiring QIC to reimburse appellees for any overpayments, appellees tendered their reimbursement claim to QIC. Following QIC's refusal to pay, appellees counterclaimed for breach of contract.

After granting appellees' no-evidence summary judgment motion on QIC's claims for fraud, fraudulent inducement, constructive fraud, negligent misrepresentation, and tortious interference with existing and prospective business relations, the trial court held a bench trial on QIC's remaining claims for breach of contract and promissory estoppel. The parties submitted the case on an agreed stipulation of facts and stipulated exhibits. In pertinent part, the stipulation of facts provides as follows:

2. The only contract that is a subject of this cause became effective on June 1, 2002 and its termination was effective on June 6, 2003.... There are two slightly different versions of the contract attached to the Agreed Exhibit List as Exhibit 1 and Exhibit 1A. If the dispute between these two versions of the Contract should prove material to the Court's decision, the evidence the Court can use to resolve that dispute is [found in certain exhibits].

3. ... QIC provided home infusion pharmaceuticals and home infusion therapy services under the Contract to patients who were covered under medical insurance plans administered by BCBSTX and HMO Blue.

4. The patients whose claims that are the subject of QIC's only remaining cause of action for breach of the contract and the counterclaim of BCBSTX and HMO Blue are identified in the documents attached as Exhibits 2 and 3 to the Agreed Exhibit List.... The parties agree the Patient names, dates of service, codes, Exhibit A rates, billed charges, amounts paid, payment dates, and patient share figures in Exhibits 2 and 3 are true and correct.

5. Various hospitals such as Texas Childrens' Hospital, doctors, and medical clinics referred the Patients to QIC with prescriptions for infusion pharmaceuticals and infusion therapy. QIC did make calls to obtain precertification from BCBSTX and HMO Blue to administer pharmaceuticals and infusion therapy to the Patients. In some instances BCBSTX and HMO Blue gave QIC precertification, and in some instances they refused to give precertification.

6. HMO Blue maintains a network of providers who provide services to HMO Blue patients. For HMO Blue patients who had no out-of network benefits, HMO Blue would usually not precertify services by providers that HMO Blue did not recognize as a provider within its network if there was a provider in the network that provided the same services. There were several home infusion therapy providers in HMO Blue's

"Houston network." Although the Contract refers to QIC as a "Provider," HMO Blue did not recognize QIC as one of its "network" providers. In fact, QIC was advised in writing that it was not a "network" provider for the HMO Blue "Houston network" in May 2002 and again in July 2002.

7. BCBSTX also maintains a managed care "network" of providers in Houston for subscribers of its PPO plans. In some of these PPO plans, the subscribers have no out-of network benefits. For those BCBSTX PPO patients who had no out-of-network benefits, BCBSTX would usually not precertify services by providers that BCBSTX did not recognize as a provider within its Houston PPO network, if there was a provider in the network that provided the same services. There were several home infusion therapy providers in BCBSTX's "Houston PPO network". Although the Contract refers to QIC as a "Provider", BCBSTX did not recognize QIC as one of its "network" providers. In fact, QIC was advised in writing that it was not a "network" provider for the BCBSTX "Houston PPO network" in May 2002 and again in July 2002.

8. HMO Blue did not give QIC precertification for its services that it provided to the following HMO Blue members: [patients are listed], because HMO Blue's records showed that none of these HMO Blue members had "out-of network" benefits on the respective dates of service.... BCBSTX did not give QIC precertification for its services that it provided to the following BCBSTX PPO members: [patients are listed], because BCBSTX's records showed that neither of these BCBSTX PPO members had "out-of-network" benefits on the respective dates of service....

9. For the claims QIC submitted that are reflected on [the agreed exhibits], ... QIC administered the pharmaceuticals it billed for and provided the infusion therapy services it billed for, and those pharmaceuticals and services were administered as prescribed by the Patients' referring doctor and were medically necessary. QIC billed BCBSTX and/or HMO Blue its standard retail rates for its infusion pharmaceuticals and infusion therapy services provided to the Patients. QIC's standard retail price for infusion pharmaceuticals was three times the Average Wholesale Price ("AWP").

10. Of the amounts billed on [a particular patient], BCBSTX paid the ... standard retail price QIC billed for its services [on several occasions].

. . . .

12. QIC received notice from BCBSTX about the results of a Concentra Audit that showed overpayments on prior claims submitted by QIC to BCBSTX.

After hearing argument, the trial court rendered judgment that QIC take nothing on its claims, that BCBSTX recover damages in the amount of $26,044.68 plus interest, that HMO Blue recover damages in the amount of $16,201.66 plus interest, and that appellees recover their reasonable attorney's fees. In a separate instrument, the trial court entered findings of fact and conclusions of law. In pertinent part, the trial court found as follows:

1. On June 1, 2002, [QIC] entered into a contract with [BCBSTX]. This contract involved providing home infusion therapy services to patients who were subscribers of BCBSTX and/or its affiliates, including [HMO Blue]. This contract was terminated effective June 6, 2003.

2. BCBSTX and HMO Blue maintain networks of providers who provide services to patients who are subscribers or members of their managed care products in Houston, Texas. For those patients who had no "out-of network benefits", BCBSTX and HMO Blue would usually not precertify services by providers that BCBSTX and HMO Blue did not recognize as a provider within their respective managed care networks, if there was a provider in their respective managed care networks that provided the same services. There were several home infusion therapy providers in BCBSTX and HMO Blue's managed care "Houston networks." Although the Contract refers to QIC as a "Provider," BCBSTX and HMO Blue did not recognize QIC as one of their managed care "network" providers. In fact, QIC was advised in writing by BCBSTX that it was not a managed care "network" provider for the BCBSTX and HMO Blue "Houston networks" in May 2002 and again in July 2002.

3. QIC never signed the agreements required for BCBSTX and HMO Blue managed care "Houston networks". QIC never agreed to accept the discounted rates "network providers" in these managed care networks accept for the services they provide to patients who are members or subscribers of these managed care networks.

4. Under its contract, QIC could only provide "Covered Services" to subscribers of the Defendants. QIC's services were "Covered Services" only if the patient's health care coverage provided a benefit for the home infusion therapy services provided by QIC. If a patient was a member or subscriber of the HMO Blue "Houston Network" or the BCBSTX PPO "Houston Network", and the patient's coverage provided no "out-of network" benefits, any services QIC provided to that patient were not "Covered Services".

5. QIC was also required under the contract to obtain precertification of its services from BCBSTX and/or HMO Blue as a condition precedent to payment under its contract. HMO Blue did not give QIC precertification for its services that it provided to the following HMO Blue members: [patients are listed], because HMO Blue's records showed that none of these HMO Blue members had "out-of network" benefits on the respective dates of service.... BCBSTX did not give QIC precertification for its services that it provided to the following BCBSTX PPO members: [patients are listed], because BCBSTX's records showed that neither of these BCBSTX PPO members had "out-of-network" benefits on the respective dates of service....

6. With the exception of some overpayments, BCBSTX paid the claims QIC submitted for [patients are listed] at the rates specified in Exhibit A of QIC's contract. The overpayments made by BCBSTX to QIC on these claims total $5497.69.

7. BCBSTX overpaid most of the claims QIC submitted for [a particular patient] after QIC submitted "corrected claims" that changed the number of units/days of a drug, Neupogen, from 10 to 30. [The patient]'s physician had ordered that she receive 300 mcg of Neupogen for 10 days at a time. As a result of this error, BCBSTX overpaid QIC $20,546.99 on the "corrected" claims....

....

9. ... BCBSTX ... notified QIC of overpayments it had previously made that were identified in the Concentra audit.

10. BCBSTX did not pay any of the claims QIC submitted for [patients are listed], because QIC did not obtain and could not have obtained precertification of the services it provided to these patients who had no "out-of network" benefits.

11. HMO Blue did not pay any of the claims QIC submitted for [patients are listed], because QIC did not obtain and could not have obtained precertification of the services it provided to these patients who had no "out-of-network" benefits.

12. With the exception of two claims, HMO Blue did not pay any of the claims QIC submitted for [a particular patient], because QIC did not obtain and could not have obtained percertification of the services it provided to [the patient], since he also had no "out-of network" benefits. HMO Blue erroneously paid two of the claims submitted by QIC more than one year after the contract terminated when QIC filed a complaint. The overpayments on these two claims total $14,650.60.

13. With the exception of one claim it overpaid, HMO Blue paid the claims QIC submitted for [a particular patient] at the rates specified in Exhibit A of QIC's contract. The overpayment HMO Blue made on one claim QIC submitted for [the patient] was $1551.06.

In pertinent part, the trial court concluded as follows:

2. QIC's contract with BCBSTX dated June 1, 2002 did not give QIC any rights as a "network provider" in either the managed care "Houston networks" of either BCBSTX or HMO Blue.

3. Under its contract with BCBSTX, QIC was only entitled to be paid for "Covered Services" it provided to subscribers and members of BCBSTX and HMO Blue. If a particular patient's coverage with BCBSTX and/or HMO Blue provided no benefits for "out-of-network" benefits, any services QIC provided to such a patient were not "Covered Services" and QIC was entitled to no payment for the services it provided to such a patient.

4. Under its contract with BCBSTX, QIC was also required to obtain precertification of its services as a condition precedent to payment. If QIC could not obtain precertification of its services, because the patient had no "out-of network" benefits, QIC was not entitled to be paid for the services it rendered to such a patient.

5. QIC was not entitled to be paid by HMO Blue for the services it rendered to [patients are listed]; because these patients had no "out-of-network" benefits, QIC was not a "network provider" in HMO Blue's managed care "Houston network", these services were not "Covered Services" under the contract, and QIC did not obtain precertification from HMO Blue for the services it provided to these patients.

6. QIC was not entitled to be paid by BCBSTX for the services it rendered to [patients are listed]; because these patients had no "out-of-network" benefits, QIC was not a "network provider" in BCBSTX's managed care "Houston network", these services were not "Covered Services" under the contract, and QIC did not obtain precertification from BCBSTX for the services it provided to these patients.

7. The rates specified in Exhibit A of QIC's contract with BCBSTX applied to all claims QIC submitted for "Covered Services" to either BCBSTX or HMO Blue. Although its contract with BCBSTX required QIC to bill for its services at its retail rates, Articles 2 and 6 of the contract clearly identify Exhibit

A attached to the contract as the reimbursement mechanism for QIC's services under the contract. It is also clear under Article 6 that neither BCBSTX nor HMO Blue nor the patients who received "Covered Services" from QIC were liable for payment of a sum based on charges made in excess of the rates specified in Exhibit A of the contract.

8. Exhibit A of the contract specifies rates for particular infusion therapy services provided by QIC. Exhibit A also states that QIC shall be reimbursed for drugs its [sic] provides at the AWP for the drug. QIC was not entitled to be paid for the "Covered Services" it provided under the contract at any rates in excess of those specified in Exhibit A of the contract, and QIC was not entitled to be reimbursed for the drugs its [sic] provided at any rate more than the AWP of the particular drug.

9. With the exception of some overpayments, BCBSTX correctly paid QIC for the "Covered Services" it provided to [patients are listed].

. . . .

11. BCBSTX overpaid the claims QIC submitted for [a particular patient], because it paid these claims at rates in excess of the rates specified by Exhibit A of the contract. The amount of these overpayments was $20,546.99. BCBSTX also made overpayments totaling $5497.69 on the claims QIC submitted for [patients are listed]. BCBSTX is entitled to recover all of these overpayments, totaling $26,044.68[,] from QIC under Article 6D of the contract.

12. With the exception of one overpayment, HMO Blue ... correctly paid QIC for the "Covered Services" it provided to [a particular patient] at the rates specified in Exhibit A of the contract. The single overpayment ... was in the amount of $1551.06, and HMO

Blue is entitled to recover it from QIC under Article 6D of the contract.

13. HMO Blue also paid two claims QIC submitted on [a particular patient] in error. [He] did not have "out-of-network" benefits and the services QIC provided to him were not "Covered Services" under the contract. The erroneous payments HMO Blue made on these two claims total $14,650.60, and HMO Blue is entitled to recover these overpayments from QIC under Article 6D of the contract.

14. Neither BCBSTX nor HMO [Blue] breached QIC's contract with BCBSTX. Accordingly, QIC takes nothing on all its claims seeking affirmative relief in this cause.

15. BCBSTX is entitled to recover the sum of $26,044.68 from QIC for the overpayments it made to QIC under the contract, and HMO Blue is entitled to recover the sum of $16,201.66 from QIC for the overpayments it made to QIC under the contract.

On appeal, QIC contends that no evidence supports the trial court's conclusion that the contract does not give QIC any rights as a "network provider" in appellees' Houston managed care networks, or, alternatively, that this conclusion is against the great weight and preponderance of the evidence. Hence, QIC maintains, the trial court also erred in concluding that QIC is not entitled to payment for the infusion therapy services it provided to subscribers who do not have out-of-network benefits. With respect to the services it provided to those subscribers who *have* out-of-network benefits, QIC contends the trial court erred in concluding that appellees properly paid QIC at the rates specified in Exhibit A to the contract, rather than at QIC's standard retail rates. QIC further contends there is no evidence, or insufficient evidence, to support the trial court's con-

clusion that QIC breached the contract by failing to reimburse appellees for the overpayments they made to QIC. In addition, QIC asserts that the trial court erred in awarding appellees their attorney's fees under Civil Practice and Remedies Code section 38.002 because there is no evidence that appellees presented their claim to QIC under subsection (2) of the statute. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.002(2) (Vernon 1997). Finally, QIC contends the trial court erred in granting a no-evidence summary judgment for appellees on its claims for fraud, fraudulent inducement, negligent misrepresentation, and tortious interference with existing and prospective business relations, because it presented more than a scintilla of evidence to support every element of each of these claims.

## ANALYSIS

### Bench Trial

#### *Standard of Review*

In an appeal from a bench trial, a trial court's findings of fact have the same weight as a jury's verdict. *Amador v. Berrospe,* 961 S.W.2d 205, 207 (Tex.App.-Houston [1st Dist.] 1996, writ denied). When challenged, findings of fact are not conclusive if, as here, there is a complete reporter's record. *Id.* When there is a reporter's record, the trial court's findings of fact are binding only if supported by the evidence. *Id.* If the findings are challenged, we review the sufficiency of the evidence supporting the findings by applying the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994).

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* at 822. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

In reviewing a factual sufficiency point, we consider all the evidence supporting and contradicting the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). In a bench trial, the trial court, as fact-finder, is the sole judge of the credibility of the witnesses. *Southwestern Bell Media, Inc. v. Lyles,* 825 S.W.2d 488, 493 (Tex.App.-Houston [1st Dist.] 1992, writ denied).

We review de novo a trial court's conclusions of law, and uphold them on appeal if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002); *In re Moers,* 104 S.W.3d 609, 611 (Tex.App.-Houston [1st Dist.] 2003, no pet.). An appellant may not challenge a trial court's conclusions of law for lack of factual sufficiency, but we review the legal conclusions drawn from the facts to determine their correct-

ness. *BMC Software Belgium,* 83 S.W.3d at 794.

### QIC's Breach of Contract Claim

QIC challenges nearly all of the trial court's findings of fact and conclusions of law on the ground that they "cannot support the trial court's judgment that QIC take nothing on its breach of contract claim." [1] As all of QIC's arguments relate to whether the trial court properly interpreted various provisions of the contract, we turn now to an examination of the contractual language at issue.

### 1. The Contractual Term "Provider"

The contract states as follows:

### Home Infusion Therapy Provider Contract

**This Contract** is between Blue Cross and Blue Shield of Texas, ... hereinafter called BCBSTX, and Quality Infusion Care, a Home Infusion Therapy Provider located in [H]arris County, Texas, hereinafter called the Provider.

QIC asserts that "a plain reading of the Contract shows that the term 'Provider', as used in the Contract, can only mean 'in-network provider'." Appellees maintain that the parties did not intend for the term "Provider" to mean "in-network provider," as evidenced by two letters appellees sent to QIC advising it that it is not a network provider.

█ In construing a written contract, our primary concern is to ascertain the true intent of the parties as expressed in the instrument. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). We examine the entire writing in an effort to harmonize and give effect to

all of its provisions so that none will be rendered meaningless. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous, and we construe the contract as a matter of law. *Id.* On the other hand, a contract is ambiguous if its meaning is uncertain and doubtful, or if it is susceptible to more than one reasonable interpretation. *Nat'l Union,* 907 S.W.2d at 520; *Coker,* 650 S.W.2d at 393. Whether a contract is ambiguous is a question of law. *Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 423 (Tex.2000). If a contract is determined to be ambiguous, then a court may consider extraneous evidence to ascertain the true meaning of the instrument. *Nat'l Union,* 907 S.W.2d at 520.

█ An ambiguity in a contract may be either "patent" or "latent." *Id.* A patent ambiguity is evident on the face of the contract. *Id.* A latent ambiguity arises when a contract that is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. *Id.* When a contract contains an ambiguity, either patent or latent, the interpretation of the instrument becomes a fact issue. *Coker,* 650 S.W.2d at 394. The trier of fact must resolve the ambiguity by determining the true intent of the parties. *Id.* at 394–95.

█ This case involves the meaning of the contractual term "Provider." QIC urges that "Provider" means "in-network provider"; appellees maintain that "Provider" means simply "provider"—not "*network* provider." When the contracting parties set forth their own definitions of

1. Specifically, QIC challenges Findings of Fact Nos. 3, 4, and 6–14 and Conclusions of Law Nos. 2–17.

the terms they employ, we are not at liberty to disregard those definitions and substitute other meanings. *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex.App.-Tyler 2005, no pet.). Here, however, the parties did not define the term "Provider." Nor do any of the contractual provisions shed light on the meaning of the term.[2] The contract employs the term "Provider" throughout and simply does not contemplate a distinction between "provider" and "*network* provider."

Thus, after carefully reviewing the contract, we conclude that the term "Provider" is latently ambiguous. Though the term does not appear ambiguous on its face, "[a]pplying the ['Provider'] language to the context of the claim[s] here .... produce[s] an uncertain or ambiguous result," because the term is "fairly susceptible of more than one construction." *Nat'l Union*, 907 S.W.2d at 521; *Healthcare Cable*, 180 S.W.3d at 792. "Provider" could mean "in-network provider," as QIC contends, or it could mean simply "provider," without bestowing on QIC the additional status of "network provider," as appellees contend. Based on the language employed, neither QIC's interpretation of the contract nor that of appellees is any less reasonable. *Healthcare Cable*, 180 S.W.3d at 792.

Given this latent ambiguity in the contract, the question of the proper construction of the term became one for the trier of fact—here, the trial court. *Coker*, 650 S.W.2d at 394–95. To determine the meaning of the term "Provider," the trial court looked to several items of extrinsic evidence. *See Nat'l Union*, 907 S.W.2d at 520 (noting that, upon determination that contract is ambiguous, court may consider extrinsic evidence to determine true meaning of contract).

First, the court observed that "QIC was advised in writing by BCBSTX that it was not a managed care 'network' provider for the BCBSTX and HMO Blue 'Houston networks' in May 2002 and again in July 2002." The contract became effective June 1, 2002. The stipulated exhibits show that, in May 2002, and again in July 2002, appellees sent letters to QIC advising it that it is not a network provider. Thus, QIC was on notice one month before the contract became effective (and again one month after it became effective) that appellees did not consider QIC to be a network provider. In fact, QIC stipulated that, "[a]lthough the Contract refers to QIC as a 'Provider,' HMO Blue [and BCBSTX] did not recognize QIC as one of [their] 'network' providers."

The trial court also observed that "QIC never signed the agreements required by BCBSTX and HMO Blue [for their] managed care 'Houston networks[,]'" and "never agreed to accept the discounted rates 'network providers' in these managed care networks accept for the services they provide to patients who are members or subscribers of these managed care networks." The stipulated exhibits demonstrate that appellees require network providers to sign a contract different from the one that QIC signed. QIC's contract includes Exhibit A, which sets forth a "fee schedule" for QIC's services. A column

---

**2.** QIC asserts that Article 14 of the contract, which states that "[t]he Provider may refer to its status as a Provider contracting with BCBSTX in advertising or descriptions of its services[,]" lends support to its interpretation that it is an in-network provider. We disagree. Article 14 merely states that QIC may, in advertising its services, refer to itself as a "Provider"—the provision does not say that QIC may refer to itself as an "*in-network* provider." As such, Article 14 is of no aid in discerning the meaning of the term "Provider."

entitled "Traditional Allowed" lists the rates appellees will use in compensating QIC for its services. In contrast, the "network contract"—a document QIC did not sign—has a different fee schedule entirely. Specifically, appellees compensate their network providers in accordance with the lower rates set forth in a column entitled "Managed Care Allowed." The stipulated exhibits reveal that, in 1999, QIC declined to become a network provider. As the July 2002 letter to QIC states, "In August 1999, we did offer a [network] contract to your company, but the previous owner declined it. They felt the rates were too low and they saw not [sic] benefit to contracting with us for that product. The proposed [network] agreements were never returned." This evidence is sufficient to support the trial court's conclusion that the parties did not intend for the term "Provider" to mean "in-network provider."

■ QIC urges that appellees are "estopped from contending that QIC is not an 'in-network provider' because they have specifically recognized QIC as an 'in-network provider' by paying QIC's claims submitted for patient's [sic] that BCBSTX and HMO Blue claim had no 'out-of-network' benefits." Though QIC correctly states that appellees paid *some* of the claims QIC submitted for subscribers who do not have out-of-network benefits, appellees did not consistently do so. To the contrary, appellees rejected numerous claims for subscribers who do not have out-of-network benefits.[3] Moreover, the contract expressly contemplates that appellees might pay claims in error on occasion, as evidenced by Article 6D: "In the event of any overpayment, duplicate payment, or other payment in excess of that to which the Provider is entitled, the Provider agrees to make repayment to BCBSTX within thirty (30) days of notification by BCBSTX of such overpayment, duplicate payment or other excess payment."

■ The Texas Supreme Court rejected a similar estoppel argument in *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 733–34 (Tex.1981). In that case, appellants argued that Sun Oil Company's conduct in sharing proceeds from working interest gas with appellants for over forty years "create[d] an estoppel against Sun to assert, at this late date, a construction different from the mutual construction of the parties." *Id.* The supreme court rejected this argument, holding that estoppel "does not create a contract right that does not otherwise exist." *Id.* at 734. We likewise conclude that appellees' occasional payment of claims for subscribers with no out-of-network benefits does not entitle QIC to assert a right under the contract to be paid as an in-network provider. Accordingly, we reject QIC's estoppel argument, particularly because the contract contemplates that such payments may occur due to error.[4]

In sum, we conclude, as a matter of law, that the contractual term "Provider" is latently ambiguous. As such, the trial

---

3. *See* Finding of Fact No. 5.

4. QIC also asserts that we should construe the contract against appellees, since they drafted the contract. "The principle of construing a contract against its drafter ... is to be used only as a last resort[,]" however. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 291 (Tex.App.-Houston [1st Dist.] 1997, pet. denied); *see also Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1043 (5th Cir.1991) ("[A] contract generally is construed against its drafter only as a last resort—i.e., after the application of ordinary rules of construction leave a reasonable doubt as to its interpretation."). Here we need not resort to construing the contractual language against appellees because the extrinsic evidence discussed above makes clear that the parties did not intend for "Provider" to mean "in-network provider."

court properly considered extrinsic evidence relating to the parties' intent in employing the term in their contract. Moreover, the evidence is sufficient to support the trial court's factual determination that "Provider" does not mean "network provider." Hence, we conclude that the contract does not make QIC an in-network provider, and we hold that the trial court's findings of fact and conclusions of law incorporating this interpretation of the contract are supported by substantial evidence.

### 2. Contractual Precertification

QIC contends appellees breached the contract by refusing to precertify QIC's proposed treatments for several patients.[5] Our conclusion that QIC is not a network provider is dispositive of this issue.

Article 4 of the contract provides as follows:

ARTICLE 4—Precertification for Treatment

A. Precertification is the process by which the medical necessity of Covered Services is approved or denied in advance.

B. The Provider shall precertify Covered Services listed on the attached Exhibit(s) for each Subscriber as a condition precedent to payment of a claim. The Provider shall submit to BCBSTX a treatment plan for each Subscriber seeking Covered Services.

C. While precertification is not an assurance or guarantee of payment, it does mean that BCBSTX will not deny a claim on the basis of medical necessity.

The contract defines "Covered Services" and "Subscriber" as follows:

ARTICLE 1—Definitions

A. Covered Services means those home infusion therapy services for which benefits are available under a Subscriber's health care coverage.

B. Subscriber means any person entitled to receive Covered Services under health care coverage provided or administered by (1) BCBSTX, (2) a Blue Cross and/or Blue Shield Plan of another state, (3) an affiliate of HCSC [Health Care Service Corporation] or (4) a subsidiary of a Blue Cross and/or Blue Shield Plan of another state. The phrase "provided or administered" includes an insurance arrangement, an administrative services agreement, or an arrangement whereby an employer or welfare benefit plan or any third party payor contracts with BCBSTX to utilize providers that have contracted with BCBSTX. The term "affiliate" includes, but is not limited to, any entity in which HCSC has an ownership interest.

QIC maintains that, because appellees stipulated all of the services QIC provided to the patients at issue were medically necessary, appellees breached the contract by wrongfully refusing to precertify treatments for particular patients. QIC correctly asserts that precertification involves a consideration of "medical necessity"; however, as QIC acknowledges in its brief, precertification applies only to "Covered Services."

The contract defines "Covered Services" as "those home infusion therapy services for which benefits are available under a Subscriber's health care coverage." Thus, by the plain terms of the contract, if a particular subscriber's health care coverage does not include out-of-network bene-

---

5. The patients at issue are listed in Finding of Fact No. 5.

fits, then a service provided by an out-of-network provider, no matter how medically necessary that service may be, does not qualify as a "Covered Service," and therefore is not eligible for precertification. Given our determination that QIC is not a network provider, appellees properly refused to precertify QIC's proposed treatments for subscribers who do not have out-of-network coverage. QIC admits as much by premising its arguments regarding precertification on the presumption that it is an in-network provider. We have determined that it is not. Accordingly, we reject QIC's argument that appellees breached the contract by refusing to precertify infusion therapy services for patients who do not have out-of-network coverage.[6]

### 3. Contractual Payment Provisions

 Though several of the claims at issue in this case involve patients who do not have out-of-network coverage, other claims involve patients *with* out-of-network coverage. Thus, we turn to QIC's contention that appellees breached the contract by failing to compensate QIC at its "standard retail rates" for the services it provided to those patients with out-of-network coverage.

The payment provisions of the contract provide as follows:

ARTICLE 2—Schedule of Reimbursement

A. The reimbursement mechanism which will be used as the basis for payment of Covered Services by BCBSTX to the Provider is a part of the Contract and will be as described in the Exhibit(s) attached to this Contract.

ARTICLE 5—Billing

A. As soon as possible after providing Covered Services to a Subscriber holding health care coverage, the Provider shall furnish to BCBSTX a claim for services furnished such Subscriber....

ARTICLE 6—Payment of Benefits

A. BCBSTX will, following receipt of itemized statements in complete and accurate form, pay to the Provider the amount of its obligation under the Subscriber's health care coverage. When submitting charges under the Contract, the Provider shall bill BCBSTX its standard retail price (i.e., the highest price the Provider bills any other carrier) for the service(s) rendered. The Provider will base the Subscriber's share of the cost on the Provider's standard retail price or the BCBSTX allowable amount as set forth in the Exhibit(s), whichever is less.

B. Neither BCBSTX nor the Subscriber shall be liable for payment of (1) any sum based upon charges made at rates in excess of those stipulated in the attached Exhibit(s) or (2) initial services or continued services for which the Provider did not obtain precertification/recertification.

The "attached Exhibit" to which the contract refers is Exhibit A, a "List of IV Services with Attached Fee Schedule." As already discussed, the "Attached Fee Schedule" is a chart setting forth the "Traditional Allowed" amount for the various infusion therapy services QIC provides. Exhibit A specifies that "[e]ach drug dispensed in conjunction with a therapy listed on the attached fee schedule will be reimbursed at AWP [average wholesale price]." Exhibit A also reiterates that,

---

**6.** QIC stipulated that appellees' records show that all of the patients for whom appellees refused to precertify treatment do not have out-of-network benefits.

[w]hen submitting charges under this Exhibit A, the Provider will bill HMO Blue Texas its standard retail price (i.e., the highest price the Provider bills any other carrier) for the service(s) rendered. The Provider will base the Subscriber's share of the cost on the Provider's standard retail price or the BCBSTX allowable amount as set forth in this Exhibit, whichever is less.[7]

QIC contends that Article 6A and Exhibit A "specifically allow QIC to bill and be paid its standard retail price," and the trial court erred in concluding otherwise.[8] We disagree. Rather, we conclude, as a matter of law, that the payment provisions of the contract are unambiguous and that the trial court's interpretation of them is correct.

The trial court concluded as follows:

7. The rates specified in Exhibit A of QIC's contract with BCBSTX applied to all claims QIC submitted for "Covered Services" to either BCBSTX or HMO Blue. Although its contract with BCBSTX required QIC to bill for its services at its retail rates, Articles 2 and 6 of the contract clearly identify Exhibit A attached to the contract as the reimbursement mechanism for QIC's services under the contract. It is also clear under Article 6 that neither BCBSTX nor HMO Blue nor the patients who received "Covered Services" from QIC were liable for payment of a sum based on charges made in excess of the rates specified in Exhibit A of the contract.

8. Exhibit A of the contract specifies rates for particular infusion therapy services provided by QIC. Exhibit A also states that QIC shall be reimbursed for drugs its [sic] provides at the AWP for the drug. QIC was not entitled to be paid for the "Covered Services" it provided under the contract at any rates in

---

**7.** The parties stipulated that "[t]here are two slightly different versions of the contract," Agreed Exhibits 1 and 1A. Agreed Exhibit 1, which is the only contract QIC contends it signed, contains only one Exhibit A, the language of which is quoted above (i.e., the exhibit refers to HMO Blue throughout). Appellees, on the other hand, contend that they signed Agreed Exhibit 1A, which contains two Exhibit As—one of which refers to HMO Blue and one of which refers to BCBSTX. In all other respects, the two contracts are identical.

QIC asserts that, because the Exhibit A that is attached to Agreed Exhibit 1 only references HMO Blue, and not BCBSTX, "any limitations contained in the Exhibit A[ ] do not apply to BCBSTX, and cannot limit the amounts recoverable by QIC for treatments rendered to BCBSTX insureds." The trial court did not decide which version of the contract controls. Assuming without deciding that Agreed Exhibit 1 (QIC's version) controls, we nonetheless reject QIC's argument. Although the Exhibit A that is attached to Agreed Exhibit 1 references only HMO Blue, the attached fee schedule is entitled "Blue Cross Blue Shield of Texas Home Infusion Therapy Fee Schedule." Moreover, Article 2A of the contract that comprises Agreed Exhibit 1 expressly provides that "[t]he reimbursement mechanism which will be used as the basis for payment of Covered Services by *BCBSTX* to the Provider is a part of the Contract and will be as described in the Exhibit(s) attached to this Contract." (Emphasis added). Article 6B adds that *"BCBSTX ... shall [not] be liable for payment of ... any sum based upon charges made at rates in excess of those stipulated in the attached Exhibit(s)."* (Emphasis added). The only exhibit that is attached to Agreed Exhibit 1 is Exhibit A. Accordingly, the limitations set forth in Exhibit A apply to BCBSTX, even though the exhibit primarily references HMO Blue. Any other interpretation would render the language of Articles 2A and 6B meaningless. See *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("[C]ourts should examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless.") (emphasis in original).

**8.** Specifically, QIC challenges Conclusions of Law Nos. 7 and 8.

excess of those specified in Exhibit A of the contract, and QIC was not entitled to be reimbursed for the drugs its [sic] provided at any rate more than the AWP of the particular drug.

The trial court's interpretation of the payment provisions of the contract is correct as a matter of law. That is, although Article 6A and Exhibit A state that QIC "shall *bill* BCBSTX its standard retail price," the contract does not require appellees to *pay* QIC its standard retail price. (Emphasis added). To the contrary, Article 2A states that the *"reimbursement mechanism* which will be used as the *basis for payment* of Covered Services by BCBSTX to [QIC] is ... described in ... Exhibit [A]." (Emphasis added). Moreover, Article 6B expressly caps appellees' liability: "BCBSTX ... shall [not] be liable for payment of ... any sum based upon charges made at rates in excess of those stipulated in ... Exhibit[ A]." Exhibit A further states that "[e]ach drug dispensed in conjunction with a[n infusion] therapy [service] will be reimbursed at AWP [average wholesale price]," not QIC's retail price. These contractual provisions plainly govern reimbursement—though QIC bills appellees according to its standard retail price, appellees are not obligated to pay QIC anything more than the rates set forth in Exhibit A.[9] We therefore reject QIC's contention that it is entitled to be reimbursed at its standard retail rates.

\* \* \*

The contract requires appellees to compensate QIC for the "Covered Services" it provides to appellees' subscribers using the rates specified in Exhibit A. Given our determination that the contract does not make QIC an in-network provider, we conclude that appellees are not obligated to reimburse QIC for the services it provided to subscribers who do not have out-of-network benefits, as these services do not constitute "Covered Services" under the contract. Moreover, we conclude that appellees properly reimbursed QIC at the Exhibit A rates for the "Covered Services" it provided to those subscribers with out-of-network coverage. Accordingly, we affirm the trial court's judgment that QIC take nothing on its breach of contract claim.

### *Appellees' Breach of Contract Counterclaim*

QIC contends the trial court erred in concluding that it breached the contract by failing to return to appellees certain overpayments that they had made to QIC under the contract. QIC bases its argument, in large part, on its contention that the contract makes it an in-network provider, and that it is entitled to be reimbursed at its standard retail rates. As we have already determined that the contract does not make QIC an in-network provider, and does not entitle QIC to be paid its standard retail rates, we reject this portion of QIC's argument.

QIC alternatively contends "there is *no* evidence that BCBSTX and/or HMO Blue ever notified QIC of such overpayments as required by Article 6D of the Contract." Article 6D states as follows: "In the event

---

9. QIC's standard retail price becomes relevant in determining the *subscriber's* share of the cost of infusion therapy services. That is, under Article 6A, QIC "will base the Subscriber's share of the cost on [its] standard retail price or the BCBSTX allowable amount as set forth in ... Exhibit [A], whichever is less."

Thus, in the event QIC's standard retail price is lower than the Exhibit A rate for a particular service provided to any given patient, that patient's share of the cost will be calculated using QIC's standard retail price instead of the Exhibit A amount.

of any overpayment, duplicate payment, or other payment in excess of that to which the Provider is entitled, the Provider agrees to make repayment to BCBSTX within thirty (30) days of notification by BCBSTX of such overpayment, duplicate payment or other excess payment." QIC stipulated, however, that it "received notice from BCBSTX about the results of a Concentra Audit that showed overpayments on prior claims submitted by QIC to BCBSTX." In light of its stipulation that it received notice of the overpayments, we reject QIC's argument that there is no evidence of notice.

■■■ The overpayments at issue relate to certain claims for which appellees either (1) made payments to QIC even though the subscribers at issue do not have out-of-network benefits or (2) paid QIC using its standard retail rates rather than the Exhibit A rates.[10] Given our conclusion that appellees are not contractually obligated to compensate QIC for the services it provided to subscribers who do not have out-of-network benefits, and are required only to pay QIC at the Exhibit A rates for the services it provided to subscribers with out-of-network benefits, we hold that QIC breached Article 6D of the contract by failing "to make repayment to BCBSTX within thirty (30) days of notification by BCBSTX of such overpayment[s]." Accordingly, we conclude that the trial court properly found in favor of appellees on their breach of contract counterclaim.

The parties stipulated as to the Exhibit A rates, the amounts QIC billed, and the amounts appellees paid for each of the claims at issue. Appellees point out, however, that the stipulated exhibit contains an error regarding the overpayment amounts for three subscribers.[11] Rather than stating that the overpayments for these three subscribers total $5497.69, the exhibit should list the total as $2655.88. With this modification, we affirm the trial court's judgment as it relates to appellees' counterclaim. *See* TEX.R.APP. P. 43.2(b) (stating that appellate court may modify trial court's judgment and affirm it as modified).

### Attorney's Fees

QIC contends the trial court erred in awarding appellees their attorney's fees under Civil Practice and Remedies Code section 38.002 because "there is no evidence that [appellees'] claims for attorney's fees were presented to QIC as required by [subsection (2) of the statute]." QIC concedes that appellees' counsel averred in his affidavit that he tendered appellees' counterclaim to QIC's counsel in September 2003, but urges that "[counsel]'s affidavit provides no other information or evidence relating to this purported presentment, and therefore does not meet the presentment requirements of § 38.002."

■■■ As a general rule, each party bears the cost of its own attorney, absent a contractual or statutory provision to the contrary. *Panizo v. Young Men's Christian Ass'n of the Greater Houston Area,* 938 S.W.2d 163, 168 (Tex.App.-Houston [1st Dist.] 1996, no writ). Section 38.001(8) of the Civil Practice and Remedies Code provides that a party may recover reasonable attorney's fees if its claim is for "an oral or written contract." TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997). To recover attorney's fees under

10. The overpayments involve claims that QIC submitted for the patients identified in Findings of Fact Nos. 6, 7, 12, and 13 and Conclusions of Law Nos. 11–13.

11. The error relates to claims QIC submitted for the patients identified in Finding of Fact No. 6 and Conclusion of Law No. 11.

the statute, the claimant must comply with the following requirements:

(1) the claimant must be represented by an attorney;

(2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and

(3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

*Id.* § 38.002(1)-(3). Presentment of a claim under section 38.002(2) is required to allow the entity against whom it is asserted an opportunity to pay it before incurring an obligation for attorney's fees. *Panizo,* 938 S.W.2d at 168. The act of filing suit does not, by itself, constitute presentment. *Id.*

▇▇▇ No particular form of presentment is required—it may be written or oral. *Id.* "[A]ll that is necessary is that a party show that its assertion of a debt or claim and a request for compliance was made to the opposing party, and the opposing party refused to pay the claim." *Standard Constructors, Inc. v. Chevron Chem. Co.,* 101 S.W.3d 619, 627 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (citing *Panizo,* 938 S.W.2d at 168). Moreover, we construe the statute liberally to promote its underlying purposes. TEX. CIV. PRAC. & REM.CODE ANN. § 38.005 (Vernon 1997).

▇▇▇ Here, appellees' counsel averred in his affidavit that he "tendered [his] clients['] counterclaim to Quality Infu-

sion Care, Inc.'s attorney in September 2003."[12] This is sufficient evidence of presentment under section 38.002(2). *See Panizo,* 938 S.W.2d at 168–69 (holding "testimony of Panizo's attorney [that he had presented Panizo's claim several times in writing to appellee's attorney] established that Panizo presented her contract claim"); *Birdwell v. Texins Credit Union,* 843 S.W.2d 246, 251 (Tex.App.-Texarkana 1992, no writ) (determining that affidavit of appellant's attorney satisfied presentment requirement of section 38.002 because it "allege[d] that after attempts to collect failed, a demand letter was sent and not responded to, and then this suit was prepared and filed"); *see also Harrison v. Gemdrill Int'l, Inc.,* 981 S.W.2d 714, 719 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (holding appellant's trial testimony that, when he informed appellee of his resignation, he told appellee he wanted to "collect his pay 'without fail,' " constituted sufficient evidence of presentment).[13] We therefore affirm the trial court's judgment awarding appellees their reasonable attorney's fees.

## No–Evidence Summary Judgment

### Standard of Review

We review the trial court's ruling on a summary judgment motion de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). We view the evidence in a light most favorable to the non-movant, making all reasonable inferences and resolving all doubts in the non-movant's favor. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222 (Tex.

---

**12.** Appellees did not file their counterclaim until July 2004.

**13.** QIC also complains that "[t]here is no evidence [appellees] presented to QIC an amount that [they] would have accepted to resolve their claims." A claimant, however, "is not required to make a demand of the exact

amount it is entitled to recover." *West Beach Marina, Ltd. v. Erdeljac,* 94 S.W.3d 248, 269 (Tex.App.-Austin 2002, no pet.) (rejecting appellant's argument that, because appellees never asked for exact amount that was allegedly due, presentment was not satisfied).

1999). Because the summary judgment order does not specify the ground or grounds on which the trial court relied for its ruling, we affirm the summary judgment if any of the summary judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex.2000).

Here, appellees sought a no-evidence summary judgment. In a no-evidence summary judgment, the movant represents that no evidence exists as to one or more essential elements of the non-movant's claims, upon which the non-movant would have the burden of proof at trial. TEX.R. CIV. P. 166a(i); *Jackson v. Fiesta Mart*, 979 S.W.2d 68, 70–71 (Tex.App.-Austin 1998, no pet.). On review, we ascertain whether the non-movant produced more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.* More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). If the evidence does no more than create a mere surmise or suspicion of fact, less than a scintilla of evidence exists. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003). Although the non-moving party is not required to marshal its proof, it must present evidence that raises a genuine fact issue on each of the challenged elements. TEX.R. CIV. P. 166a(i).

### Tort Claims

■ Prior to the bench trial, appellees sought a no-evidence summary judgment on QIC's claims for fraud, fraudulent inducement, constructive fraud, negligent misrepresentation, and tortious interference with existing and prospective business relations. QIC responded by presenting the following evidence: (1) an affidavit from its president, James Rutherford; (2) a copy of the contract with a transmittal letter; (3) claim forms for several subscribers; (4) the July 2002 letter advising QIC that it is not a network provider; (5) other pieces of correspondence; (6) a payment spreadsheet; (7) a copy of a BCBSTX webpage listing QIC as a "provider"; and (8) letters from appellees to two subscribers advising them that the request for QIC to provide services was not authorized because the same service could be provided by an in-network provider. The trial court granted summary judgment in favor of appellees.

QIC contends the trial court erred in granting summary judgment for appellees on its fraud, fraudulent inducement, negligent misrepresentation, and tortious interference with existing and prospective business relations claims because it presented more than a scintilla of evidence to support each element of every claim.[14] All of QIC's tort claims are predicated on its assumption that the contract makes it a network provider. For instance, with respect to its fraud claims, QIC asserts that "the language in Articles 1 and 14, and the repetitive use of the term 'Provider[,]' is ... a direct representation to QIC that it is an 'in-network provider.'" Similarly, QIC asserts that its negligent misrepresentation claim "is based upon the same representations, which form the basis of QIC's fraud claim.... The representations made in the Contract were ... that the

---

**14.** QIC does not challenge the summary judgment concerning its constructive fraud claim and therefore has waived any error. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex.1998); *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex.1990); *Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex.1987).

Contract made QIC an 'in-network provider.'" With respect to its tortious interference claims, QIC maintains that appellees willfully and intentionally interfered with its existing and prospective business relationships by sending letters to its patients and referral sources advising them that QIC is not an in-network provider.[15]

The Texas Supreme Court has recently determined, however, that we may consider the trier of fact's later findings in a breach of contract case in determining the propriety of the trial court's earlier grant of summary judgment on related bad-faith and extra-contractual claims. *Progressive County Mut. Ins. Co. v. Boyd,* 177 S.W.3d 919, 920 (Tex.2005). *Progressive* involved an insurance coverage dispute. *Id.* The appellant, Boyd, was involved in an automobile accident and submitted a claim to his insurance carrier, Progressive, for uninsured motorist benefits. *Id.* Progressive denied the claim and Boyd sued, alleging breach of contract, DTPA and Insurance Code violations concerning the alleged bad-faith denial of his claim, and conversion. *Id.*

The trial court granted summary judgment on all of Boyd's extra-contractual claims, which had been severed from the breach of contract claim. *Id.* Three months later, the breach of contract claim was tried to a jury. *Id.* After the jury found that Boyd had not been involved in an accident with an uninsured vehicle, the trial court entered a take-nothing judgment in favor of Progressive. *Id.*

On appeal, our court affirmed the breach of contract judgment, but reversed the summary judgment on the extra-contractual claims, noting that summary judgment cannot be affirmed on grounds not raised in the trial court, and the jury's breach of contract finding was not before the trial court at the time it granted the summary judgment. *Id.* at 921. We therefore held that there was a fact issue on Boyd's common-law bad-faith claim. *Id.*

The Texas Supreme Court reversed, concluding that "the jury's findings may be considered on appeal." *Id.* It noted that Boyd's pleadings made clear that all of his claims were predicated on his insurance policy and the accident being covered under the insurance policy. *Id.* at 920. Thus, the court concluded, "even if the trial court erred by granting summary judgment as to the bad-faith and extra-contractual claims, the error was harmless because the jury finding in the breach of contract case negated coverage of the occurrence by Progressive's insurance policy." *Id.* In reaching its conclusion, the court noted that "a trial court is not required to vacate a summary judgment and then reinstate it to accomplish the same end." *Id.* at 921.

Like the supreme court, we conclude that, because all of QIC's tort claims are predicated on its assumption that the contract makes it a network provider, and because the trial court later concluded after a bench trial that the contract does not make QIC a network provider, we may consider the trial court's subsequent finding in determining the propriety of the summary judgment on the tort claims. Hence, "even if the trial court erred by granting summary judgment as to the [tort] claims, the error [i]s harmless because the [trial court's] finding in the breach of contract case negated [QIC's assertion that it is a network provider, which formed the predicate for QIC's tort

---

**15.** QIC attached only two letters to its summary judgment response—both of which are letters that appellees sent to two of their subscribers, not hospitals or clinics or doctors— in which appellees advise the subscribers that the request for QIC to provide services was not authorized because the same service could be provided by an in-network provider.

claims]."[16] *Id.* at 920. As the supreme court noted, "a trial court is not required to vacate a summary judgment and then reinstate it to accomplish the same end." *Id.* at 921. We therefore affirm the no-evidence summary judgment.

## CONCLUSION

We conclude that the trial court properly held that QIC take nothing on its breach of contract claim because the contract does not make QIC a network provider and does not entitle QIC to be reimbursed at its standard retail rates. We further conclude that QIC has not shown that the trial court erred in granting summary judgment for appellees on QIC's tort claims. With respect to appellees' counterclaim for breach of contract, we conclude that the trial court correctly determined that QIC breached the contract by failing to return certain overpayments to appellees. Moreover, the trial court properly awarded appellees their attorney's fees. Appellees confess, however, that the final judgment contains an error in calculation regarding the total amount of the overpayments. We therefore modify the judgment of the trial court to reflect that the overpayments total $23,202.87, and affirm the judgment as modified.

16. During the bench trial, counsel for QIC reminded the trial court that "[t]here were initially other claims by Summary Judgment Motions, if the Court will remember, ruling against all of our tort claims and leaving in the contract claims. And the Court [ha]s stated that it sees this case as a contract case. We do, too."