Opinion Issued April 3, 2008
















Opinion Issued April 3, 2008

 

 

 

 

 













 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 

 



NO. 01-07-00188-CV

 

 



PRIDE INTERNATIONAL, INC., Appellant

 

V.

 

PAUL A. BRAGG, Appellee

 

 



On Appeal from the 295th District Court

Harris County, Texas








Trial Court Cause No. 2005-63586

 

 



O P I N I O N

          This
case arises from a falling out between a corporate CEO and his former
employer.  After Pride International,
Inc. fired Paul Bragg and paid him a severance owed under his employment
agreement, Bragg sued Pride for breach of that contract, contending that the
Pride owes him three times as much in severance as it had paid him.  Pride counter-claimed against Bragg for
breach of fiduciary duty, contending that Bragg had misrepresented his opinion
of the value of the severance package to Pride and its shareholders, in that he
never disclosed that he thought the agreement (and others like it) was worth so
much.  The trial court granted summary
judgment both to Pride and to Bragg, so that both received a take-nothing
judgment.  Both appeal the trial court’s
judgment.  We conclude that the
employment agreement is not ambiguous, and that Bragg failed to raise a fact
issue as to breach of the agreement.  We
further conclude that Pride has raised no issue of fact under Delaware law as to any material breach of
fiduciary duty.  We therefore affirm.

Background

Bragg’s Employment with Pride

          Pride
hired Bragg as its chief financial officer (“CFO”) in July 1993.  In 1998, Pride promoted Bragg to President
and Chief Operating Officer.  In February
1999, the parties executed an employment agreement.  The following month, Pride promoted Bragg to
Chief Executive Officer (“CEO”), after the current CEO, Ray Tolson,
retired.  

Bragg served as Pride’s CEO from
March 1999 until June 2005, when Pride asked for, and received, Bragg’s
resignation.  Pride’s board chairman
provided Bragg with a “Summary of Separation Benefits” term sheet, which
outlined the termination benefits that Bragg would receive pursuant to the
February 1999 employment agreement.  The
following day, Bragg executed a resignation letter agreement.  Thirty days following his resignation, Pride
paid Bragg $8 million in severance, as contemplated in the letter of
resignation.

The Employment Agreement  

The provisions in the agreement that
govern Bragg’s term of employment and termination are sections 3.03 and
3.05.  They read:

3.03 TERM OF EMPLOYMENT (“EMPLOYMENT PERIOD”).
Executive’s regular employment (no Change in Control being presently
contemplated) will commence on the Effective Date of this Agreement and will be
for a term of two (2) years ending at 12:00 o’clock midnight February 4, 2001;
thereafter, the Term of Employment of Executive will be automatically extended
for successive terms of one (1) year each commencing February 5, 2001, and on
February 5 of each year thereafter, unless Company or Executive gives written
notice to the other that employment will not be renewed or continued after the
next scheduled expiration date which is not less than one year after the date
that the notice of non-renewal was given. 
All extended employment terms will be considered to be within the
Employment Period while Executive is employed with the Company. 

 

3.05 TERMINATION WITHOUT CHANGE IN CONTROL.  The Company shall have the right to terminate
Executive at any time during the Employment Period (including extended
term).  Should the Company choose not to
renew or extend the Employment period of this Employment Agreement or choose to
terminate the Executive during, or at the end of, the Employment Period, or in
the event of death or disability of the Executive, if the termination is not
after a Change of Control and is not for cause, the Company shall, within
thirty (30) days following such termination, pay and provide to the Executive:

 

a. An amount equal to two full years of
his base salary . . .

 

b. The Company shall provide to Executive for a period
of two (2) full years following the Date of Termination, life, health, accident
and disability insurance. . . .

 

c. An amount equal to two (2) times the target award
for the Executive under the Company’s annual bonus plan for the fiscal year in
which the termination occurs . . . .

 

The section 3.05 severance benefits
also include the value of the Executive’s retirement plan, stock options, and
life, health, hospitalization, medical, and accident benefits to the Executive’s
spouse and dependents for same term as the Executive’s benefits.  

Though Bragg acknowledges that he
received severance pay pursuant to the agreement’s provision dealing with
termination, he contends that he is entitled to $17 million in additional
compensation.  He urges that, under
section 3.03 of the agreement, the term of his employment had “renewed” the
February before he resigned, and thus, Pride’s termination was not effective
until the end of the renewal period for the purpose of calculating his
severance.  Under his reading of section
3.03 of the agreement, Bragg contends that he should have continued to receive
the salary and benefits he received as a current employee, listed in section
3.04 of the agreement, through the end of his renewal period, plus the
severance.  Section 3.04 of the agreement
sets forth Bragg’s compensation during the Employment Period.  It reads:

3.04 COMPENSATION AND BENEFITS.  During the Employment Period the Executive
shall receive the following compensation and benefits:

 

a. He shall receive an annual base salary of not less
than his [sic] annual base salary which is $334,000, with the opportunity for
increases, from time to time thereafter, which are in accordance with the
Company’s regular executive compensation practices.  Executive’s salary will be reviewed at least
annually by the Compensation Committee of the Board of Directors.

 

b. . . . [H]e shall be eligible to participate on a
reasonable basis, and to continue his existing participation, in annual bonus,
stock option and other incentive compensation plans which provide opportunities
to receive compensation in addition to his annual base salary which are the
greater of: (i) the opportunities provided by the Company for Executives with
comparable duties, or (ii) the opportunities under any such plans in which he
was participating immediately prior to the Effective Date of this Agreement.

 

c. . . . [H]e shall be entitled to receive and
participate in salaried employee benefits including, but not limited to:
medical, life, health, accident and disability insurance and disability
benefits . . . .

 

Section 3.04 benefits also include
retirement benefits, paid vacations, use of Company car, and participation in
incentive stock and benefit plans.  

Pride denies that section 3.03
requires it to compensate Bragg beyond the amount set forth in section
3.05.  It observes that section 3.05
grants it the “right to terminate [Bragg] at any time (including any extended
term).” 

The Breach of Fiduciary Duty Claim

During Bragg’s tenure, he rejected
claims against Pride advanced by two departing officers, under sections 3.03
and 3.05 of the employment agreement, which urged the very interpretation he
now makes against Pride.  These former
officers, John O’Leary, a former president of Pride, and Jonathan Talbot, a
former vice-president of marketing, had employment agreements similar to
Bragg’s agreement.  Both O’Leary and
Talbot advanced claims for additional compensation under the same
interpretation of section 3.03 that Bragg now advances, and Bragg, as CEO,
rejected them.  In addition, In March
1999, the head of the compensation committee asked Bragg to summarize the
severance due to the outgoing CEO, Ray Tolson, if Pride terminated him without
cause.  Bragg included in Tolson’s
benefits only the severance outlined in section 3.05.  

In response to Pride’s contract
defenses, Bragg testified that he had always understood his contract to require
additional compensation under the section 3.03 renewal provision.  Bragg’s assertion that he had held this
opinion while CEO but did not advise Pride of it or otherwise act to clarify
the language prompted Pride to counter-sue him for breach of fiduciary duty,
contending that Bragg had failed to disclose material information to
Pride—namely, Bragg’s understanding of the employment agreement.

The Trial Court’s Ruling

          In
October 2006, the trial court granted summary judgment dismissing with
prejudice Bragg’s breach of contract claim for additional compensation under
section 3.03 of the agreement.  In
December 2006, the trial court granted summary judgment dismissing with
prejudice Pride’s counterclaim against Bragg for breach of fiduciary duty.  The trial ordered that both parties take
nothing by their suits.

Summary Judgment

We review a
trial court’s summary judgment de novo.  Valence Operating Co. v.
Dorsett, 164
S.W.3d 656, 661 (Tex. 2005); Provident
Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex.
2003).  Under the traditional
standard for summary judgment, the movant has the burden to
show that no genuine issue of material fact exists and that the trial court
should grant a judgment as a matter of law.  Tex. R. Civ. P. 166a(c); KPMG Peat Marwick
v. Harrison
 County
Hous. Fin. Corp., 988
S.W.2d 746, 748 (Tex.
1999).  In our review, we take as true all evidence favorable to the nonmovant,
and indulge every reasonable inference and resolve any doubts in the
nonmovant’s favor.  Dorsett, 164 S.W.3d at 661;
Knott, 128 S.W.3d at 215; Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).    Our task is to “consider whether
reasonable and fair-minded jurors could differ in their conclusions in light of
all of the evidence presented.”  Goodyear
Tire & Rubber Co. v. Mayes, 236 S.W.3d 754, 755–56 (Tex.
2007) (citing Wal-Mart
Stores, Inc. v. Spates,
186 S.W.3d 566, 568 (Tex. 2006); City of Keller v. Wilson, 168 S.W.3d
802, 822–25 (Tex.
2005)).  When, as here, a summary
judgment does not specify the grounds on which it was granted, we will affirm
the judgment if any one of the theories advanced in the motion is meritorious. Joe
v. Two Thirty Nine Joint Venture, 145 S.W.3d 150, 157 (Tex. 2004).

BRAGG’S APPEAL

          Bragg
contends that Pride breached its employment agreement with him by (1) failing
to compensate Bragg for its failure to give him notice of non-renewal of the
agreement before terminating his position as CEO; (2) awarding $400,000 as his
2004 bonus rather than $1.023 million; and (3) requiring him to pay the
employee portion of the insurance premiums for the benefits provided to him
after his termination.  Bragg contends
that the agreement is, at a minimum, ambiguous on these matters, thus
precluding summary judgment.  Pride
responds that section 3.05 of the agreement unambiguously provides that Pride
may terminate Bragg at any time without notice, including during any extended
term, and expressly sets forth all severance compensation, whether the
termination be “during, or at the end of, the Employment Period.”  

Contract Interpretation

Our primary concern in interpreting a contract
is to ascertain and give effect to the intent of the parties as it is expressed
in the contract.  Seagull Energy E & P, Inc.
v. Eland Energy, Inc., 207 S.W.3d 342, 345 (Tex. 2006).  To
achieve this objective, “courts should examine and consider the entire writing
in an effort to harmonize and give effect to all the provisions of the contract
so that none will be rendered meaningless.” 
Dorsett, 164
S.W.3d at 662.  

Whether a contract is
ambiguous is a question of law for the court. 
Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex.
1996).  If the contract is so worded that
it can be given a certain or definite legal meaning or
interpretation, then it is not ambiguous, and a court should construe
the contract as a matter of law.  SAS Inst., Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005) (quoting Coker
v. Coker, 650 S.W.2d 391, 393 (Tex. 1983));
ACS Investors, Inc. v. McLaughlin,
943 S.W.2d 426, 430 (Tex.
1997).  An unambiguous contract is construed
according to the plain meaning of its express wording. 
Dorsett,
164 S.W.3d at 662. 
Unambiguous contracts are enforced as written.  Heritage Res., Inc., 939 S.W.2d at 121. 

In contrast, “[a] contract is ambiguous
when its meaning is uncertain and doubtful or is reasonably susceptible to more
than one interpretation.”  Id.  We determine whether a contract is ambiguous by examining
it as a whole, in light of the circumstances present when the parties entered the
contract.  Universal Health Servs.,
Inc. v. Renaissance Women’s Group, P.A., 121 S.W.3d 742, 746 (Tex.
2003).  If a court
determines a contract is ambiguous, then a factfinder may consider extraneous
evidence to ascertain the true meaning of the instrument.  Nat’l
Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517,
520 (Tex.
1995).  If an ambiguity exists, either
patent or latent, contract interpretation becomes a fact issue, resolved by
deciding the parties’ true intent.  Coker, 650 S.W.2d at 394; Quality
Infusion Care, Inc. v. Health Care Serv. Corp., 224 S.W.3d 369, 379 (Tex. App.—Houston
[1st Dist.] 2006, no pet.). 

Analysis

Here, the parties agree that Pride
did not notify Bragg of the expiration of the employment agreement as
authorized in section 3.03. The dispute concerns whether Pride was required to
give one-year’s notice under pain of continuing to pay Bragg a salary or
whether, as expressed in section 3.05, Pride could terminate at any time
(including during the Employment Period) so long as it provided the agreed-upon
severance.  Bragg reads sections 3.03 and
3.05 as enumerating separate obligations, triggering multiple remedies,
requiring Pride to provide salary and compensation under section 3.04 of the
agreement as if he remained in Pride’s employ, in addition to severance
benefits until the agreement expired. 
Pride observes, however, that notice of non-renewal does not trigger any
compensation other than that defined in section 3.05 because section 3.05
expressly allows Pride to terminate an executive at any time, including “during
the Employment Period,” provided that it compensates the Executive with the
severance benefits enumerated in that section. 


We agree with the trial court that
sections 3.03 and 3.05 are not ambiguous. 
Section 3.03 sets forth the period of Bragg’s employment, or as the
agreement defines it, the “Employment Period.” 
It declares: “All extended employment terms will be considered to be
within the Employment Period while the Executive is employed with the
Company.”  Bragg asserts that this
sentence relates only to an employee’s voluntary departure, but the provision
contains no limiting language.  Section
3.03 says that when an employee is employed with the company, he is within his
employment period, and thus is entitled to compensation under section
3.04.  It does not suggest that a fired
employee nonetheless continues to be within the employment period.  Under section 3.03, an executive who is not
employed with the company is not within any “employment period.”

Tacitly conceding this interpretation
of section 3.03 to be reasonable, Bragg claims that section 3.04 suggests
otherwise.  Section 3.04, which outlines
an executive’s compensation and benefits, during employment, states: “During
the Employment Period, the Executive shall receive the following compensation
and benefits. . . .”  Bragg urges us to
construe this language in conjunction with yet another section of the
agreement, section 2.06, which defines “termination” as used in the agreement:

“[T]ermination shall mean termination, prior to the
expiration of the Employment Period, of the employment of the Executive with
the Company {including death and disability (as described below)} for any
reason other than cause (as described below) or voluntary resignation (as
described below).  Termination includes
“Constructive Termination” as described below. 
Termination includes non-renewal or failure to extend this Agreement at
the end of any employment term, except for cause.

 

The agreement then elaborates on the
various kinds of termination, including disability, cause, constructive
termination, and voluntary resignation. 
Section 2.06 concludes by stating:

Termination that entitles the Executive to the
payments and benefits provided in the “Termination Payments and Benefits”
Section hereof shall not be deemed or treated by the Company as the termination
of the Executive’s employment or the forfeiture of his participation, award, or
eligibility, for the purpose of any plan, practice or agreement of the Company
referred to in the Compensation and Benefits Section hereof.

 

Bragg suggests that the word
“agreement” in this last sentence includes the employment agreement
itself.  Thus, he asserts, his
termination under section 3.05 should not be deemed a termination of his
employment for the purpose of his employment agreement, but instead, he
remained within his Employment Period even after termination for purposes of
calculating the money owed to him until the expiration of the period following
renewal of the agreement.  Like the trial
court, we disagree with Bragg’s interpretation.   Section 2.06 refers to the compensation and
benefits in section 3.04; it does not modify “termination” as defined under the
agreement.  The only reasonable
construction of “plan, practice or agreement” in section 2.06 is as a reference
to the insurance, stock, and retirement plans for which Bragg continues to be
eligible under his severance package as described in section 3.05.  If we applied Bragg’s interpretation and construed
“agreement” in section 2.06 to include the Employment Agreement as a whole, it
would render the last sentence of section 3.03 and the entirety of section 3.05
meaningless.  That is not a reasonable
interpretation.  See Dorsett, 164 S.W.3d at 662 (“Courts should examine and consider the entire
writing in an effort to harmonize and give effect to all the provisions of the
contract so that none will be rendered meaningless.”).

Bragg further relies on section 3.05(j), a
savings clause, which states: “The Company’s obligation under this Section to
continue to pay or provide . . . insurance to the Executive and [his
dependents] during the remainder of the Employment Period shall be reduced”
when Executive is provided these benefits by another employer.  According to Bragg, if the employment period
were over, section 3.05(j) would be meaningless, because there would be no
employment period during which to provide insurance benefits.  Section 2.06, however, states that the
Employment Period is not treated as terminated with respect to the employee
benefit plans made a part of the severance package under section 3.05.  Bragg thus is treated as within his
Employment Period under section 3.05(j) only for purposes of the insurance and
other benefits expressly provided as a part of his severance.

          Finally,
Bragg contends that sections 3.03 and 3.05 are ambiguous when read together
because section 3.03 requires notice of termination, while section 3.05 allows
an employee to be terminated at any time. 
We conclude that these sections can be harmonized without creating any
ambiguity.  

Section 3.03 creates a term of employment for
Bragg, or an Employment Period.  The
contract guaranteed Bragg a term of at least one, and as much as two years’
employment under his extended term.[1]  Section
3.05 allows Pride to terminate an executive at any time, including “during, or
at the end of the Employment Period,” as long as it pays the executive the
benefits enumerated in section 3.05.  
Bragg contends that an interpretation that section 3.05 is the sole
compensation when Pride terminates an employee without notice renders section
3.03 meaningless.  We disagree.   The severance provided in section 3.05 provides Bragg with two
years’ salary and benefits, which is the maximum amount of time that an
employee could have received salary and benefits under the agreement upon
automatic renewal.  Section 3.05 thus
provides salary and benefits for at least the same amount of time that an
employee would receive them if he had been provided notice under section 3.03.  “When an employment contract
requires a certain period of notice, the employment may be cancelled on shorter
notice or upon none at all if the employee is paid wages or salary for the
specified notice period.”  Hussong v. Schwan's Sales Enter., Inc.,
896 S.W.2d 320, 326 (Tex. App.—Houston [1st Dist.] 1995, no writ); see also
Stolz v. Wells, 43 S.W.2d 163, 165 (Tex. Civ. App.—Beaumont 1931, no writ).  With the severance payment, Pride paid Bragg
his salary for the specified notice period. 


Section 3.05 contemplates the
possibility that an executive could be terminated “during” his employment
period and outlined the benefits owed in such an event.  A severance pay provision serves “to assure a worker whose employment
has terminated certain funds while he seeks another job.”  Martin v. Mann Merchandising, Inc., 570 S.W.2d 208, 209 (Tex. Civ. App.—Eastland
1978, writ ref’d n.r.e.).  Section 3.05
accomplishes that purpose by unambiguously enumerating the benefits
available in the event of termination regardless of whether it occurs due to
expiration of the employment period or earlier, due to Pride’s exercise of its
right to fire an executive at any time during the employment period.   We hold that the exercise of an express
right to terminate without cause terminates an agreement that is then in effect
because there has been no notice of non-renewal.  Because the contract does not require Pride
to pay $17 million additional compensation under section 3.03, Pride did not
breach the contract by failing to provide additional compensation beyond the $8
million it paid pursuant to its obligation under section 3.05.  

2004 Annual Bonus

          Bragg
contends that Pride also breached its contract by improperly reducing his 2004
incentive bonus.  According to Bragg’s
summary judgment evidence, his target bonus was $1,023,000, yet he received
only $400,000 from Pride.  Bragg asserts
that although Pride had discretion to award bonuses, its discretion is limited,
and Pride was required to treat Bragg on the same basis that it treated other
Pride executives of comparable duties who received proportionally larger
bonuses.  With respect to bonuses,
Section 3.04 contract states: 

“[Bragg] shall be eligible to participate on a
reasonable basis . . . in incentive compensation plans which provide
opportunities to receive compensation in addition to his annual base salary
which are the greater of: (i) the opportunities provided by the Company for
Executives with comparable duties; or (ii) the opportunities under any such
plans in which he was participating immediately prior to the Effective Date of
this Agreement.”

 

Bragg does not contend that he was
not given comparable participation opportunities in incentive compensation
plans, only that his bonus was lower than comparable executives.  Pride’s proxy statements state that any bonus
is discretionary.  The employment
agreement merely provides that Bragg is eligible to receive bonuses, but it
does not require that they be paid; rather, it refers to incentive plans that
are separate from the agreement.  Bragg
has failed to raise a fact issue that his 2004 bonus was nondiscretionary under
the employment agreement.  We thus hold
that the trial court properly granted summary judgment on this claim.

Insurance Benefits

          Bragg’s
final issue is that Pride breached its employment agreement by not paying the
employee portion of his insurance benefits provided under section 3.05(b),
which states: “The Company shall provide to Executive for a period of two (2)
full years following the Date of Termination, life, health, accident, and
disability insurance.  These benefits are
not to be less than the highest benefits furnished to the Executive during the
term of this Agreement.”  This section
does not support Bragg’s contention that Pride must pay the employee’s share of
insurance premium costs.  It merely
obligates Pride to provide coverage and benefits that match those Bragg
received while in Pride’s employ, which it has done.  We hold that the contract does not require
Pride to pay Bragg’s share of his insurance costs if he paid them as an
employee, and thus, Pride did not breach its contract.  The trial court therefore properly granted
summary judgment on this claim.

PRIDE’S APPEAL

Pride contends that Bragg breached
his fiduciary duty by failing to disclose to Pride his personal opinion that
his employment agreement obligated Pride to pay him both severance pay under
section 3.05 and a salary until his employment period otherwise would
expire.  It further contends that Bragg
misrepresented the extent of Pride’s potential liability for his and similar
employment agreements in failing to disclose his interpretation of the
agreement.  We agree with the trial court
that Bragg is entitled to summary judgment on Pride’s claim.

Breach of Fiduciary Duty Under Delaware  Law

Because Pride is incorporated in Delaware, Delaware
law governs Pride’s breach of fiduciary duty claim.[2]  In a breach of fiduciary duty case, the
plaintiff must prove that: (1) a fiduciary duty exists; and (2) a fiduciary
breached that duty. See O’Malley v. Boris,
742 A.2d 845, 849–50 (Del. 1999) (analyzing breach of fiduciary duty claim
based on two-part test).  In addition to
his CEO title, Bragg also served as a director. 
Directors of Delaware
corporations have a fiduciary relationship with both the stockholders and the
corporation upon whose board they serve.[3]  Malone
v. Brincat, 722 A.2d 5, 10 (Del. 1998).  The director’s fiduciary duty to both the
corporation and its shareholders is a “triad: due care, good faith, and
loyalty.”  Id.; see also Cede
& Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993).  

These general fiduciary
duties specifically include a duty of disclosure.  Malone,
722 A.2d at 10.  This duty obligates
directors to provide the stockholders with accurate and complete information
material to a transaction or other corporate event.  Id.; see also Mills Acquisition Co.
v. Macmillan, Inc., 559
A.2d 1261, 1283 (Del. 1988) (fiduciaries may not “use superior information or
knowledge to mislead others in performance of their own fiduciary obligations”).  Disclosure does not mean, however, that a
board must know every fact, and directors have no duty to disclose speculative
or contingent information.  See Benihana of Tokyo, Inc. v. Benihana, Inc., 891 A.2d 150, 179 (Del. Ch. 2005);
Arnold v. Soc’y for Sav. Bancorp, Inc., 650
A.2d 1270, 1280 (Del. 1994) (Generally, “Delaware law does not
require disclosure of inherently unreliable or speculative information which
would tend to confuse stockholders or inundate them with an overload of
information.”).  Rather, directors
are responsible for considering material facts that are reasonably available,
not those that are immaterial or out of the board’s reasonable reach. 
Benihana,  891 A.2d at 179.; Brehm v. Eisner, 746 A.2d 244, 259 (Del. 2000).  The term “material” in this context means
“relevant and of a magnitude to be important to directors in carrying out their
fiduciary
duty of
care in decision-making.”  Benihana,  891 A.2d at 179
(quoting Brehm, 746 A.2d at 260
n.49).  This meaning is distinct from the
use of the term “material” in the quite different context of disclosure to
stockholders in which “[a]n omitted fact is material if there is a substantial
likelihood that a reasonable shareholder would consider it important in
deciding how to vote.”  Brehm, 746 A.2d at 260 n.49; O’Malley v. Boris, 742 A.2d 845, 850
(Del. 1999).  In other words, “there must
be a substantial likelihood that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having significantly altered the ‘total
mix’ of information made available.”  Rosenblatt
v. Getty Oil Co., 493
A.2d 929, 944 (Del. 1985) (quoting TSC
Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  A threshold question, therefore, is whether the
information that Pride alleges should have been disclosed, or was disclosed but
was allegedly false and misleading, is material.  If this information is not material as a
matter of law, the allegations will not support a claim that Bragg violated his
disclosure duties.

Analysis

Pride contends that Bragg’s opinion
concerning his employment agreement is material because: (1) if Bragg’s opinion
as to the interpretation of the agreement were correct, Pride’s potential
liability under his and similar agreements could have been increased by sixty
to one-hundred million dollars; (2) Bragg’s opinion concerned employment
contracts other than his own, and as CEO, his opinion was material to the
negotiation of those contracts; and (3) if Pride had known about Bragg’s
opinion, it would have taken actions to expressly nullify such an
interpretation.  We hold that, in this
context, these reasons are insufficient to raise an opinion to the level of a
material disclosure.

First, Bragg did not fail to disclose
factual information not otherwise available to Pride.  On the contrary, Pride drafted the disputed
employment contract in consultation with legal counsel.  Moreover, Pride’s directors knew that
conflicting views concerning the interpretation of section 3.03 existed because
former directors and employees had unsuccessfully pursued claims based on the
same understanding of the contract during Bragg’s tenure with the company.  Bragg’s opinion, therefore, would not have
provided new information to the Board and would not have assisted the Board in
its decision-making duties.  

Pride contends that Bragg’s opinion
is material because if it had known about Bragg’s opinion, it would have taken
corrective action.  Pride, however, did
not take any corrective action when former president O’Leary advanced a claim
consistent with Bragg’s opinion.  Bragg’s
opinion thus was not material to the Board or the shareholders in its
decision-making process, as it already had the opinion of another high-ranking
officer that the employment agreement was ambiguous.  

Pride further contends that Bragg
made false representations to the shareholders when he signed proxy statements
that were inconsistent with his true opinion regarding section 3.03.  When confronted with the former directors’
claims, Pride maintained its belief that section 3.03 did not provide
compensation for terminated employees beyond that expressed in section
3.05.  Bragg adopted proxy statements on
behalf of Pride that reflected Pride’s position in regard to its employment
agreements.  He was not required to
provide the shareholders with speculative information based upon his personal
opinion about the contract’s interpretation when Pride already had determined
that this was an incorrect interpretation. 
See Cede & Co. v. Technicolor,
Inc., 634 A.2d 345, 372 (Del. 1993) (affirming trial court’s finding that
there was no need to disclose share value which target director initially
deemed acceptable, without consulting investment advisors, because non-disclosure
was “plainly not material”); see also In
re Best Lock Corp. S’holder Litig., 845 A.2d 1057, 1070–75 (Del. Ch. 2001) (dismissing
disclosure claims because alleged misrepresentations were immaterial); In re Lukens Inc. S’holders Litig., 757
A.2d 720, 735–36 (Del. Ch. 1999) (granting motion to dismiss because alleged
omission or misrepresentation did not meet materiality test).

Second, Bragg had no duty to disclose
his private views as to the interpretation of the agreement in the context of
negotiating and renewing his own employment. 
In such a context, a corporate officer acts in his individual capacity,
as it is evident that the company and the employee are adverse to each other in
the context of negotiating that employee’s compensation.  See In
re Walt Disney Co. Derivative Litigation, 906 A.2d 27, 49–51 (Del. 2006) (holding president did not breach his fiduciary duty when he
negotiated and accepted severance provisions of employment agreement or when he
accepted a full payout upon termination).

Because the shareholders and directors
had prior knowledge that conflicting views existed regarding its employment
agreement and chose not to take corrective action, Bragg’s opinion would not
have “significantly altered the ‘total mix’ of information.”  TSC
Indus., 426 U.S.
at 449.  We thus hold that Bragg’s
opinion was not material.  Bragg
therefore did not breach his fiduciary duty by failing to disclose it.  

Conclusion 

          We
conclude that the employment agreement in dispute is not ambiguous as to the
severance the company owes upon firing its chief executive, and that Bragg has
failed to raise a fact issue as to his claim that Pride breached the
agreement.  We further conclude that
Pride has raised no issue of fact under Delaware
law that Bragg materially breached his fiduciary duty to the company.  We therefore affirm the judgment of the trial
court.

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Chief Justice
Radack and Justices Jennings and Bland. 

 

 











[1] The contract required Pride to give Bragg notice of
termination at least one year prior to the renewal date of February 5.  Thus, if Pride did not give Bragg notice of
non-renewal until the renewal date, Bragg’s employment period would continue
for two years.  This is because the
notice would be one day less than one year from the date of the notice of
non-renewal, so the notice would not take effect until February 4 of the
following year.





[2]           Under
article 8.02 of the Texas Business Corporation Act, the rights and duties of
directors and stockholders in corporate matters are governed by the laws of the
state of incorporation. Tex. Bus. Corp.
Act Ann. art 8.02 § A (Vernon 2003); Hollis
v. Hill, 232 F.3d 460, 464–65 (5th Cir. 2000). 

 





[3]              Texas law recognizes a similar relationship between a
corporation and its director.  See Myer v. Cuevas, 119 S.W.3d 830, 835–36 (Tex. App.—San Antonio
2003, no pet.) (corporate officers owe fiduciary duties to the corporations
they serve); see also Hughes v. Houston Northwest Medical Center,
Inc., 680 S.W.2d 838, 843 (Tex.
App.—Houston [1st Dist.] 1984, writ ref’d n.r.e.) (corporate
officers and directors owe corporation and shareholders duty to act only in
their best interest).