**Opinion issued April 2, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00111-CV

———————————

**ASHLEY SMITH, Appellant**

**V.**

**STEVEN BARNHART, Appellee**

---

**On Appeal from County Civil Court at Law No. 3**
**Harris County, Texas**
**Trial Court Case No. 1092638**

---

## O P I N I O N

This is a breach-of-contract case. Steven Barnhart sued his former mistress,

Ashley Smith, to recover sums of money he gave her over the course of their affair.

Barnhart alleged that the sums were loans, while Smith alleged that they were gifts.

The case was tried to the bench, and the trial court rendered judgment for Barnhart,

finding that Barnhart made a series of zero-interest loans to Smith; that each time Barnhart made a loan, Smith promised to pay him back; and that Smith initially complied with their agreement by making payments but later breached the agreement by refusing to continue making payments. On appeal, Smith contends that there is legally insufficient evidence that the contract (1) had clear and definite terms and (2) was supported by adequate consideration. We affirm.

## Background

Barnhart and Smith both work in the banking industry. They met in August 2011, when Barnhart began working at the same bank as Smith. They quickly developed a personal relationship, and, by the end of the year, they were having an affair.

The affair lasted for roughly three years, from December 2011 until December 2014. During this time, Barnhart gave Smith sums of money to pay for various expenses. Most notably, Barnhart gave Smith money to pay off her high-interest credit card debt; money to terminate her auto lease; money to pay her attorney in an unrelated legal matter; money to pay for moving expenses; money to pay for an antique necklace; and money to reimburse her for other money that was stolen from her.

As he continued to give Smith money, Barnhart would periodically provide her with documentation of the amount that he had given her and the amount that

2

she owed him. The documentation reflects that Barnhart and Smith understood that some of the sums of money were gifts, which Smith did not have to repay, while others were loans, which Smith did have to repay, but at zero percent interest.

On August 30, 2013, Barnhart sent Smith an email with the subject line "Loans." In the email, Barnhart explained that he was providing, in response to Smith's request, a summary of the amount of money he had loaned her up to that date. He wrote that the total amount was $47,050, specifying that the amount included $6,500 for attorney's fees that he had not yet given her, but did not include $15,000 for moving expenses, which Smith did not have to repay. He then itemized the total amount, listing 20 separate sums of money that he had loaned to Smith. The sums were divided into four categories: (1) "Short term/payment plan," (2) "Long term," (3) "To Give," and (4) "Home."

The first category, "Short term/payment plan," consisted of three sums of money, totaling $20,000, that Barnhart had loaned to Smith to pay off her credit card debt: (1) $7,500 loaned on August 19, 2013; (2) $7,800 loaned on August 26, 2013;[1] and (3) $4,700 loaned on August 29, 2013. Barnhart testified that he categorized these as "short term" loans with a "payment plan" because Smith had

---

[1]     In the email, Barnhart wrote "$7,805" for the second sum, which appears to have been a scrivener's error.

initially agreed to begin paying them off immediately at a rate of $1,000 a month, which was roughly the amount she had been paying on her credit cards.

The second category, "Long term," consisted of 16 sums of money, totaling $20,550, that Barnhart had loaned to Smith to pay for her attorney's fees and various other expenses.[2] Barnhart testified that he categorized these as "long term" loans because he knew that Smith would not be able to begin paying them back immediately and wanted to segregate them from the loans to pay off Smith's credit card debt, which he expected her to begin repaying immediately.

The third category, "To Give," consisted of a single $6,500 loan, which represented the money Barnhart had promised to loan to Smith to pay her remaining attorney's fees.

And the fourth category, "Home," consisted of a single $15,000 gift to pay for Smith's moving expenses.

---

[2] The sums of money under the second category included: (1) $5,000 loaned in October 2012; (2) $3,000 loaned in November 2012; (3) $200 loaned on December 12, 2012; (4) $500 loaned on March 17, 2013; (5) $150 loaned on April 9, 2013; (6) $500 loaned on April 10, 2013; (7) $100 loaned on April 21, 2013; (8) $2500 loaned on May 2, 2013; (9) $1,000 loaned on May 20, 2013; (10) $200 loaned on May 26, 2013; (11) $500 loaned on May 28, 2013; (12) $1,000 loaned on July 10, 2013 to pay for an overdraft to Smith's bank account; (13) $700 loaned on July 11, 2013; (14) $3,500 loaned on August 5, 2013 to pay for Smith's attorney's fees; (15) $1,300 loaned in August 2013 to pay for plane tickets and to repair Smith's fireplace; and (16) $400 loaned on August 26, 2013 to cover checks.

Four days later, on September 3, 2013, Barnhart sent Smith a follow-up email on the same chain. Barnhart notified Smith that he had given her the additional $6,500 loan to pay for her remaining attorney's fees. He stated that they could "work out" a "payment plan" that did not "stretch" her "too much" on the "entire amount" of $47,050. Smith's response was curt: "OMG." Barnhart reminded Smith that the amount he had loaned her did not include the $15,000 gift for moving expenses. Smith then observed that the total amount of money Barnhart had given her (loans and gifts) was over $60,000. Barnhart confirmed that the total amount was roughly $62,000, and Smith responded: "OMG—I am abt to vom." Barnhart tried to reassure Smith that the amount of debt was manageable, reminding her that a large portion of the loans were to "pay off existing credit card debt" and that he was not charging her any interest.

Over a month later, on October 10, 2013, Barnhart sent another email on the same chain, but with a new subject line: "Loans/Credit Cards." In the email, Barnhart informed Smith that he had loaned her an additional $5,000 to pay for additional attorney's fees, bringing the total amount to $67,000, including the $15,000 gift.

Two-and-a-half weeks later, on October 28, 2013, Barnhart's wife, Janna Barnhart, discovered that Barnhart had been having an affair with Smith. She also discovered that Barnhart had been giving Smith money.

5

Mrs. Barnhart reviewed the records for their joint banking account and found six checks that Barnhart had written to Smith for loans:

(1)     a check for $7,500 written on August 19, 2013, representing the first loan for credit card debt referenced in Barnhart's August 30 email to Smith;

(2)     a check for $7,800 written on August 26, 2013, representing the second loan for credit card debt referenced in Barnhart's August 30 email to Smith;

(3)     a check for $4,700 written on August 29, 2013, representing the third loan for credit card debt referenced in Barnhart's August 30 email to Smith;

(4)     a check for $6,500 written on September 3, 2013, representing the loan for attorney's fees referenced in Barnhart's email to Smith from that same date;

(5)     a check for $2,500 written on October 23, 2013, representing the loan for attorney's fees referenced in Barnhart's October 10 email to Smith; and

(6)     a check for $5,000 written on October 30, 2013.

Mrs. Barnhart also found checks that Barnhart had written to Smith for unspecified purposes. And she found a check for $15,000 written to Barnhart's stepmother, representing the $15,000 gift Barnhart made to Smith for moving expenses.

Later that November, sometime before Thanksgiving, Mrs. Barnhart reached out to Smith, and they met each other for lunch. At lunch, Mrs. Barnhart and Smith

6

discussed the money that Smith owed the Barnharts, and Smith indicated that she would begin paying them back once her finances permitted.

After the lunch, on November 27, 2013, Barnhart sent Smith another email. The subject line was "Loans / Credit Card." In the email, Barnhart summarized the amount of money he had given Smith up to that date. He listed five additional sums of money that he had loaned to her.[3] He then added those sums to the total amount he had given her, arriving at a total of $75,985. And then he subtracted the $15,000 he had given her as a gift, arriving at a total of $59,985. He ended by emphasizing that there was "no rush" to repay him and that he was "just documenting" the loans.

About a week later, on December 2, 2013, Smith sent Mrs. Barnhart an email to update her on Smith's finances and ability to begin repaying the loans. Smith wrote:

> I just wanted to let you know that I finally found out that we should be getting our bonus payout by the end of February at the latest. I have 3 deals I am trying to close before year end (fingers crossed) and this will ensure that I will have the ability to pay back a large portion, if not all of what I owe you. I will for sure keep you posted, as I will be able to shed more light towards the end of the year!

---

[3] Those sums included: (1) a check for $2,500, which Barnhart stated was for additional attorney's fees and matched one of the checks found by Mrs. Barnhart with "loan" written in the memo line; (2) another check for $2,500, which matched the check found by Mrs. Barnhart without a note in the memo line; (3) $1,485 in cash; (4) $1,000 in cash; and (5) $1,500 in cash to terminate her auto lease.

7

The next day, on December 3, 2013, Mrs. Barnhart responded to Smith's email: "I appreciate the update and look forward to hearing from you in February." Several months passed, but Smith did not update Mrs. Barnhart on whether any of her deals had closed. Nor did she make any payments to the Barnharts.

On April 1 2014, Mrs. Barnhart sent Smith an email to "check[] on the status of [Smith's] loan repayment." In the email, Mrs. Barnhart "suggested that [Smith] begin a monthly payment" in an amount "left up to [her]." Mrs. Barnhart also asked Smith to provide her with the amount Smith believed she still owed the Barnharts. Mrs. Barnhart explained that she wanted to compare that amount to the amount reflected in the Barnharts' records. Smith responded that her records showed that she still owed $28,000. (It is unclear how Smith arrived at $28,000; the amount is not supported by the record evidence.) Smith further responded that she would make payments as quickly as she could.

Smith did not make any payments in 2014. She did, however, make certain payments in 2015. Specifically, between April 21 and August 24, she made eight payments, ranging between $100-200 each, for a total of $1150.

On January 12, 2016—roughly four-and-a-half months after Smith's last payment of 2015—Barnhart sent Smith an email with the subject line "Copies of Check and withdrawals—debt owed to us by Ashley." The email included three attachments documenting the amount of money he had loaned her; the amount she

8

had paid back; and the amount he had decided to deduct from the principal, representing the cost of various items she had purchased for him. In the email, Barnhart told Smith that if she believed she had spent more on him, she should "feel free to deduct more." Barnhart further wrote:

> Ashley, please email me back with the amount of money you think you owe (net of the money you've already paid), whether or not you intend to pay it, and what payment plan at a minimum you intend to/can meet.

Smith responded to the email the next day, on January 13, 2016. In her response, she stated that Barnhart had loaned her a total of $65,552, that she had paid $1,750, and that she still owed $63,802. She further wrote that she would "continue to pay" as she had "done so historically." Two days later, on January 15, 2016, Smith sent Barnhart another email with the subject line "Pmt." (payment). In the email, Smith stated that she would pay "$150 on the 31st and 15th."

Smith started making payments again in 2016. Specifically, between January 5 and September 12, she made 18 payments of $150 for a total of $2,700.

On February 26, 2017—roughly six months after Smith's last payment of 2016—Barnhart sent an email to Smith's fiancée, Darren Mills, at his personal email address. At some point, as the relationship between Barnhart and Smith grew increasingly acrimonious, Barnhart and Smith decided that they would communicate with each other indirectly through Mills. In the email, Barnhart stated that it had been "about six months" since Smith's last payment and that he

wanted to get an update on whether and how Smith intended to pay off the loan. Mills did not respond to the email. Barnhart followed up by calling and texting Mills. Mills did not respond to the calls or texts, either.

On March 8, 2017, Barnhart sent Mills another email, this time to his work email address. In the email, Barnhart forwarded his previous email from February 26, stating, "I'm thinking that my texts and phone calls and emails to your [personal] account aren't reaching you so I'm trying your work address." Barnhart reiterated that his "goal" was "to understand" whether and how Smith intended to repay the loan. Mills did not respond to the email.

On March 10, 2017, Barnhart sent another email, this time to both Smith and Mills. Smith responded that a "transfer" had been made and asked Barnhart to "please leave [them] alone." The next day, on March 11, 2017, Barnhart replied to Smith's email from the previous day. He wrote that his prior emails, phone calls, and texts would have been unnecessary had Smith and Mills responded to his initial email. Barnhart noted that he had called Smith on her work line and that Smith's secretary had told him, falsely, that Smith no longer worked at the bank. Barnhart wrote that he "hates games" and warned Smith to not "try to make a fool of [him]." He reminded Smith that "the payments [were] due on the 15th and the 31st." He ended by telling her that if she would just make the payments as agreed, she would "never hear from [him] again."

In 2017, Smith made six smaller payments of $50 for a total of $300. She made the payments between March 14 and April 25. Then she stopped making payments altogether.

Barnhart hired a lawyer. On April 19, 2017, Barnhart's lawyer sent Smith a demand letter, which stated, in pertinent part:

> I have been retained by Steven F. Barnhart to collect all sums due and owing by you to Mr. Barnhart pursuant to a series of loans from Mr. Barnhart to you over a defined period of time (collectively called "Loans").
>
> By your email to Mr. Barnhart dated January 13, 2016 at 2:33 p.m., you clearly acknowledged, in writing, your debt to Mr. Barnhart as follows: "Total Owed $63,802.00". By your email to Mr. Barnhart dated January 15, 2016 at 3:38 p.m., you stated, "I will pay you $150 on the 31st and 15th". It is clear that you have failed and refused to comply with your promised payment obligations to Mr. Barnhart and, in fact, the current unpaid principal balance of the Loans is in the amount of $61,102.00, when, in accordance with the aforesaid payment plan, it should be in the amount of $59,302.00, the difference being in the amount of $1,800.00 ("Past Due Amount").
>
> Demand is hereby made that you remit to me at the address printed above a cashier's check payable to Steven F. Barnhart for the Past Due Amount, plus a cashier's check made payable to me in the amount of $650.00 as attorney's fees incurred by Mr. Barnhart . . . .

Smith did not respond to the demand letter.

### Procedural History

In May 2017, Barnhart sued Smith for breach of contract. In his petition, Barnhart alleged that he and Smith entered into a valid and enforceable contract pursuant to which Barnhart made a series of loans to Smith in exchange for

Smith's promise to pay him back. He further alleged that Smith breached the contract by failing and refusing to repay the loans in full. Barnhart sought damages in the amount of $61,102, representing the alleged remaining loan principal. Barnhart also sought attorney's fees under the Civil Practice & Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 38.001(8). Smith filed an answer, asserting that the parties never entered into a valid, enforceable contract.

The case was tried to the bench. Three witnesses testified: Smith, Barnhart, and Mrs. Barnhart.

Smith testified that, when Barnhart gave her money, he never said anything about whether she had to pay him back. In fact, he never said anything about payments at all; he only began asking her to pay him back after Mrs. Barnhart found out about the affair, and he instructed her to write Mrs. Barnhart the email in which she said she would repay the Barnharts. Smith further testified that, while she knew Barnhart was "keeping a tab," she never agreed to pay him back. The sums of money Barnhart sought to recover from her were gifts, not loans. Smith testified that the only reason she made any payments at all was because she wanted the Barnharts to stop "harassing" her and to get "out of [her] life." And she eventually stopped making payments altogether because she did not believe that she owed Barnhart anything.

Barnhart testified that, when he gave Smith money, he made it "clear" whether the money was a gift or a loan. And when it was a loan, Smith acknowledged that it was loan and promised to repay the loan. Barnhart testified that the gifts included the money to pay for Smith's moving expenses, the money to pay for her antique necklace, and the money to reimburse her for the money that was stolen from her. He testified that the loans included all other sums of money, including the money to pay off Smith's credit card debt, the money to terminate her auto lease, and the money to pay her attorney's fees. Barnhart further noted that he deducted $1,000 from the amount he loaned to Smith, explaining that the $1,000 represented the cost of various items Smith had purchased for him—ties, vinyl records, cups of coffee, and so on. Barnhart testified that he told Smith that he would deduct more if she believed she had spent more, but that Smith declined to do so. Barnhart admitted that, at the outset, he and Smith did not agree on a particular repayment schedule. But he insisted that there was always an understanding that Smith would pay him back. He testified that his "expectation" of when he would be repaid "changed" at "various points in time," as Smith initially told him that she would repay him $1,000 a month, but later said that she would repay him $150 twice a month. He further testified that, based on his experience in the banking industry, he believed a reasonable time for repayment was five-to-seven years. Barnhart admitted that, once Mrs. Barnhart found out

13

about the affair, she took an "active interest" in recovering the money Barnhart had given to Smith. But he denied instructing Smith to email Mrs. Barnhart after their lunch in October 2013.

Mrs. Barnhart, for her part, testified that, when she met Smith for lunch in 2013, they discussed the money Smith owed them and that Smith said she intended to repay them.

At the end of the trial, the trial court recited its rulings into the record. The trial court ruled that

- Barnhart and Smith had an agreement under which Barnhart loaned Smith money at zero percent interest to be repaid;

- Barnhart and Smith agreed to a repayment of the loans and identified the sums of money as loans;

- Barnhart and Smith agreed that Smith would repay Barnhart over a period of up to seven years;

- Smith partially complied with the agreement by making some payments;

- Smith breached the agreement by failing to continue making payments;

- Barnhart was entitled to recover from Smith $61,102, which was the amount due under the agreement; and

- Barnhart was entitled to recover reasonable and necessary attorney's fees.

The trial court then signed and rendered a final judgment in favor of Barnhart. Smith appeals.

**Legal Sufficiency**

In two issues,[4] Smith contends that there is insufficient evidence that the contract (1) had clear and definite terms and (2) was supported by adequate consideration. Because Smith does not specify whether she challenges the evidence for legal sufficiency or factual sufficiency, we will review her issues under the legal sufficiency standard.

**A.     Standard of review and applicable law**

In an appeal from a bench trial, a trial court's findings of fact have the same weight as a jury's verdict. *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 224 S.W.3d 369, 378 (Tex. App.—Houston [1st Dist.] 2006, no pet.). When challenged, findings of fact are not conclusive if, as here, there is a complete reporter's record. *Id.* When there is a reporter's record, the trial court's findings of fact are binding only if supported by the evidence. *Id.* If the findings are challenged, we review the sufficiency of the evidence supporting the findings by applying the same standards that we use in reviewing the sufficiency of the evidence supporting jury findings. *Id.*

The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* In making

---

[4]     In her brief, Smith raises three issues, the first two of which are, in substance, different components of the same issue. Thus, for ease of reading, we will consider Smith's first two issues together as one issue.

15

this determination, we credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* Although we consider the evidence in the light most favorable to the challenged findings and indulge every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.*

In a bench trial, the trial court, as fact-finder, is the sole judge of the credibility of the witnesses. *Id.* We review de novo a trial court's conclusions of law and uphold them on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Id.*

To prevail on a claim for breach of contract, a plaintiff must show (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained as a result of the breach. *Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 104 (Tex. App.—Houston [1st Dist.] 2015, no pet.). And to prove the existence of a valid contract, a plaintiff must show (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Id.*

**B.    Analysis**

**1.    Legally sufficient evidence of clear and definite terms**

In her first issue, Smith argues that the contract fails for indefiniteness because there is insufficient evidence that she and Barnhart agreed on all material terms. Specifically, Smith contends that there is insufficient evidence that she and Barnhart agreed on the total amount to be loaned or the terms of repayment. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (in contract to loan money, material terms generally include "the amount to be loaned" and "the repayment terms").

Barnhart responds that there is legally sufficient evidence that the parties agreed on the total amount to be loaned because Smith always promised to pay him back when he loaned her money and eventually confirmed in writing the total amount that he had loaned to her. According to Barnhart, the evidence shows that, from the beginning, the sums he loaned to Smith were characterized as loans, and he provided Smith with documentation of the amount that she owed to him. Smith agreed to repay the debt each time Barnhart loaned her money, and Smith confirmed her oral promises to repay the debt in writing, including in an email in which she confirmed the total amount Barnhart had loaned her.

Barnhart further responds that the parties' failure to specifically agree on repayment terms does not make their agreement unenforceable because the trial

court could properly imply reasonable repayment terms based on the facts and circumstances and the evidence presented.

Under Texas law, to be enforceable, a contract must address each material term with a reasonable degree of certainty and definiteness. *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Although the exact degree of certainty and definiteness varies from case to case, a contract must be at least sufficiently definite to show that the parties actually intended to be contractually bound and to enable a court to understand the parties' obligations and provide an appropriate remedy if those obligations are breached. *Id.*

A material term is a term that the parties would reasonably regard as vitally important to the agreement. *Id.* Each contract should be considered separately to determine its material terms. *Id.* In a contract to loan money, the material terms will generally be the amount to be loaned, the maturity date, the interest rate, and the repayment terms. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221.

Generally, if the parties fail to specifically agree on a material term, their contract is unenforceable. *Fischer*, 479 S.W.3d at 237. However, the law disfavors forfeitures, and contracts are construed to avoid them, especially when the parties have performed in full or in part. *See id.* at 239–40. Thus, if the parties' conduct shows that they clearly intended to agree, and a reasonably certain basis for granting a remedy exists, we will find the contract terms definite enough to provide

that remedy, even though one or more material terms are missing or left to be agreed upon. *See id.* at 239. In doing so, we may imply material terms that can reasonably be implied, such as the price, duration, or time for performance. *Id.* (duration and time of performance); *Perry v. Perry*, 512 S.W.3d 523, 528 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (time and price); *Domingo v. Mitchell*, 257 S.W.3d 34, 40 (Tex. App.—Amarillo 2008, pet. denied) (price).

We begin by considering Smith's argument that that there is insufficient evidence that she and Barnhart agreed on the total amount to be loaned.

At trial, Barnhart presented emails from Smith in which Smith acknowledged that Barnhart had loaned her money and that she had promised to pay him back. In particular, Barnhart presented Smith's email from January 13, 2016, in which she stated that Barnhart had loaned $65,552 and that she still owed him $63,802.[5] *See Khoury v. Tomlinson*, 518 S.W.3d 568, 579–80 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (holding that email correspondence between company's president and investor setting out and confirming terms under which president would repay loan to investor was sufficiently definite to create enforceable contract when parties agreed that investor would loan president

---

[5] The documentary evidence also included two emails from Smith sent to Mrs. Barnhart, one from December 2, 2013 and one from April 1, 2014. In the December 2 email, Smith told Mrs. Barnhart that she anticipated being able to "pay back a large portion, if not all of what [she] owe[d]" after receiving her bonus in February. And in the April 1 email, Smith told Mrs. Barnhart that she would "make payments as quickly as" she could.

specific amount at specific interest rate to be repaid in monthly installments over four-to-five-year period, as elected by president). And Barnhart testified that each time he loaned Smith money, she promised to repay him.

Smith's testimony conflicted with Barnhart's, and she denied ever making such promises. But her testimony cannot be reconciled with the documentary evidence, which shows that she agreed to repay the loans and recognized the total amount to be $65,552. *See id.* And even without this documentary evidence, the trial court, as factfinder, was permitted to give more weight to Barnhart's testimony in determining whether the parties agreed on the total amount to be loaned. *See Quality Infusion Care, Inc.*, 224 S.W.3d at 378 (trial court, as factfinder, is sole judge of witnesses' credibility). Viewing the evidence in the light most favorable to the trial court's finding that the parties agreed on the total amount to be loaned, and indulging every reasonable inference that supports it, we hold that the finding was supported by legally sufficient evidence.

Next, we consider Smith's argument that there is insufficient evidence that she and Barnhart agreed on the terms of repayment. There is no evidence that Barnhart and Smith agreed on specific terms of repayment when Barnhart first began to loan Smith money. There is, however, evidence that they agreed that Smith would pay him back in full and eventually further agreed that Smith would repay the loans in installments over a period of several years.

20

Barnhart testified that each time he loaned Smith money, Smith agreed to pay him back in full. He admitted that they did not agree on repayment terms when he began to loan her money. But he further testified that they eventually agreed that Smith would repay the loans in $1,000 monthly installments and that, when Smith was unable or unwilling to make those payments, they agreed that Smith would repay the loans in $150 bimonthly installments. He further testified that, based on his experience in the banking industry, five-to-seven years would be a reasonable time for repayment. *See O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 242, 244–45 (Tex. App.—San Antonio 1998, pet. denied) (holding that trial court could have implied reasonable duration of contract under which boyfriend agreed to make monthly payments to girlfriend to raise child when girlfriend testified "that her understanding was that [boyfriend] did not want his child raised by strangers, and the money therefore was a guarantee that [girlfriend] would remain with the child throughout the formative years, until the child was settled in school").

Barnhart's testimony was corroborated by the documentary evidence. In his August 30, 2013 email, Barnhart provided Smith with a summary of the amount of money he had loaned her up to that date. He itemized the total amount, listing 20 separate sums of money that he had loaned to Smith, dividing the sums into four categories, including, as relevant here, "Short term/payment plan" and "Long

term." The former category consisted of sums of money that Barnhart had loaned to Smith to pay off her credit card debt. Barnhart testified that he categorized these as "short term" loans with a "payment plan" because he and Smith had agreed that she would begin paying these off first at a rate of $1,000 per month. The latter category consisted of sums of money that he had loaned her for various other expenses. Barnhart testified that he categorized these as "long term" loans because he knew that Smith would not be able to begin paying them back immediately.

In his January 12, 2016 email, Barnhart asked Smith to provide him with the amount of money she believed he had loaned her, the amount she believed she had paid back, and a payment plan that she intended to and could meet. Smith responded in her January 13, 2016 email that Barnhart had loaned her $65,552, that she had repaid $1,750, and that she still owed $63,802. She further wrote that she would "continue to pay" as she had "done so historically." Then, in her January 15, 2016 email, Smith stated that she would pay "$150 on the 31st and 15th."

Barnhart's categorization of the loans in his August 30 email supports his testimony that he and Smith initially agreed that Smith would begin to repay the loans in $1,000 monthly installments. And Smith's confirmation in her January 13 and 15 emails that she would "continue to pay" $150 twice a month as she had "done so historically" supports Barnhart's testimony that he and Smith later agreed that Smith would repay the loans in $150 bimonthly installments. Thus, the

22

evidence shows that Barnhart and Smith agreed to terms of repayment. Smith was to repay Barnhart in $150 bimonthly installments for a period of up to seven years, at which point Smith would pay the remaining principal.

To the extent this evidence does not establish these terms with sufficient definiteness, the trial court, as factfinder, could have reasonably implied these terms from this evidence.

The parties' conduct shows that they actually intended to be contractually bound: Barnhart promised to loan Smith money, Smith promised to pay him back, Barnhart fully performed by loaning Smith the money, and Smith partially performed by making 31 payments that paid off $4,150 of the agreed-upon total amount of $65,660.[6] *See Wolf v. Wolf*, No. 01-02-01207-CV, 2003 WL 22682856, at *4 (Tex. App.—Houston [1st Dist.] Nov. 13, 2003, no pet.) (mem. op.) (holding there was sufficient evidence to support trial court's implicit finding that son had entered into contract with mother to repay one-half of student loans taken out by mother for son's benefit when son orally agreed to repay mother and then made five payments to mother). And a reasonably certain basis for granting a remedy exists: Smith breached the parties' agreement by refusing to continue making

---

[6]     We note a slight discrepancy Barnhart's alleged damages. The evidence shows that Barnhart loaned Smith a total $65,550 and that Smith repaid a total $4,150, leaving an unpaid principal balance of $61,400. But in Barnhart's demand letter, and throughout the lawsuit, Barnhart alleged that the unpaid principal balance was a slightly lower number, $61,102. However, the parties do not raise this discrepancy as an issue on appeal, and, therefore, we do not address it here.

23

payments, thereby providing a basis for the trial court to grant Barnhart a judgment in the amount of the unpaid principal. Thus, under these circumstances, the trial court could have found that Barnhart and Smith intended that the loans would be repaid within a reasonable time of up to seven years in $150 bimonthly installments.

Viewing the evidence in the light most favorable to the trial court's implied finding that the parties agreed that Smith would repay the loans in installments over a period of up to seven years, and indulging every reasonable inference that supports that finding, we hold that the finding was supported by legally sufficient evidence.

We overrule Smith's first issue.

## 2. Legally sufficient evidence of consideration

In her second issue, Smith contends that the contract fails for lack of consideration. Barnhart responds that there is sufficient evidence that the contract was supported by consideration because the evidence shows that (1) Smith orally promised to pay him back whenever he loaned her money, (2) Smith later acknowledged those promises in writing, and (3) Smith actually began to pay him back after promising to do so.

A contract must be based on valid consideration. *Iacono v. Lyons*, 16 S.W.3d 92, 94 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Consideration is a

bargained-for exchange of promises. *Id.* It consists of benefits and detriments to the contracting parties. *Id.*

Here, Barnhart testified that each time he loaned money to Smith, Smith promised to pay him back. *See Domingo*, 257 S.W.3d at 41 (holding that oral promise to repay colleague for purchasing lottery ticket constituted adequate consideration to create binding contract); *see also Iacono*, 16 S.W.3d at 94 (holding that plaintiff's alleged oral promise to share one-half of lottery winnings with defendant in exchange for defendant's oral promise to share one-half of winnings with plaintiff would constitute adequate consideration to form contract); *O'Farrill Avila*, 974 S.W.2d at 243 (holding boyfriend's contract to make monthly payment to girlfriend was supported by adequate consideration when girlfriend testified that, as consideration, she agreed to remain in city and raise couple's daughter and did in fact remain in city and raise couple's daughter). Smith testified that she never promised to repay Barnhart, but the trial court was entitled to believe Barnhart over Smith. *See Quality Infusion Care, Inc.*, 224 S.W.3d at 378.

More importantly, Smith acknowledged and memorialized her promises to repay Barnhart in various emails she sent over a three-year period. In her December 2, 2013 email to Mrs. Barnhart, Smith wrote that she believed she would be able repay most, if not all, of what she "owe[d]" the Barnharts after she received her bonus. In her April 1, 2014 email to Mrs. Barnhart, Smith wrote that

she would make payments as quickly as she could. In her January 13, 2016 email to Barnhart, Smith stated that Barnhart had loaned her a total of $65,552, that she had paid $1,750, that she still owed $63,802, and that she would "continue to pay" as she had "done so historically." And in her January 15, 2016 email to Barnhart, Smith stated that she would make bimonthly payments of $150. These emails constitute evidence that Barnhart agreed to loan Smith money in exchange for Smith's promise to pay him back—i.e., evidence that the contract was supported by adequate consideration. *See Khoury*, 518 S.W.3d at 579–80 (holding that e-mail correspondence was sufficiently definite to give rise to enforceable loan contract).

Finally, Smith actually began to repay Barnhart. Specifically, she made 31 payments over a roughly two-year period spanning between April 21, 2015 and April 25, 2017. That Smith made payments on the loans indicates that she did, in fact, promise to repay Barnhart.

We hold that there is legally sufficient evidence that the contract was supported by adequate consideration. Therefore, we overrule Smith's second issue.

## Conclusion

We affirm.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.